398 So.2d 889 (1981)
CITY OF TAMARAC, a Municipal Corporation, Appellant,
v.
Thomas John GARCHAR and Karen Garchar, His Wife, Appellees.
Nos. 77-97, 77-98.
District Court of Appeal of Florida, Fourth District.
May 1, 1981.
Rehearing Denied June 11, 1981.
*891 Sam Daniels of Daniels & Hicks, Miami, Druck, Grimmett, Scherer & James and Nancy Hoffmann, Fort Lauderdale, for appellant.
Rex Conrad of Fleming, O'Bryan & Fleming, Fort Lauderdale, for appellees.
EN BANC.

ON PETITION FOR REHEARING
The petition for rehearing is hereby granted and the following opinion issued En Banc.
This is an appeal by the defendant, City of Tamarac, from final judgments in favor of the plaintiffs, Thomas Garchar and Karen Garchar, in a personal injury action. Mr. Garchar was severely injured when his automobile struck a large boulder located on a median strip dividing a roadway. The suit was brought against defendants, Broward County, Leadership Housing Corporation, and the City of Tamarac. It was generally alleged that the County had negligently designed and constructed the road and that the City had negligently failed to remove the boulder and had improperly maintained the road and median strip. Leadership Housing Corporation (Leadership) was alleged to have negligently placed the boulder in the median strip knowing it to be dangerous.
On August 5, 1974, Mr. Garchar was driving his car on University Drive within the municipal limits of the City of Tamarac. The vehicle left the roadway and struck a large coral rock which was located at the beginning of the center median strip. Mr. Garchar sustained severe spinal cord injuries and at the time of trial was a quadriplegic. The accident occurred a few blocks from Mr. Garchar's residence and he was familiar with the highway. The coral boulder was located within six feet of the edge of the paved surface of the road and was one of several such boulders placed on the median strip by Leadership, a developer, as part of a project to beautify the median strips. The beautification project was pursuant to a city plan and agreement. The roadway was initially constructed by Broward County during the period of 1970-1972.
At trial a settlement was reached between the Garchars, Broward County and Leadership. The settlement amounted to $1,150,000 and was allocated $400,000 to Mr. Garchar's claim and $750,000 to Mrs. Garchar's claim for loss of consortium. This settlement left the City of Tamarac and its insurance carriers as the only remaining defendants.
The jury found the City of Tamarac 70% negligent and Mr. Garchar 30% negligent. The jury further found Mr. Garchar's damages to be $6,000,000 and Mrs. Garchar's damages to be $750,000. The jury's verdict applied the 30% comparative negligence finding and reduced Mr. Garchar's award to $4,200,000 and his wife's award to $525,000.[1] In post-trial proceedings the judgment for Mrs. Garchar was ordered satisfied because the $750,000 settlement allocation between her and the settling defendants exceeded her adjusted verdict of $525,000 by some $225,000. The trial court denied a request by the City to set-off the $225,000 excess against Mr. Garchar's award. Mr. Garchar's award of $4,200,000 amounted to $3,800,000 after it was reduced by a $400,000 set-off based on his settlement.
One of the insurance carriers of the City of Tamarac paid $300,000, leaving a balance due of $3,500,000. The City filed post-trial motions for remittitur, for new trial, and renewed its motion for directed verdict. All of these post-trial motions were denied and the City appeals the final judgments entered in favor of Mr. and Mrs. Garchar, respectively.
The appellant City raises the following five points:
I. Whether the City of Tamarac owed Mr. Garchar a duty to provide a crashworthy median strip?

*892 II. Whether the trial court committed reversible error in denying the City's requested jury instructions regarding alleged statutory violations by the plaintiff?
III. Whether the trial court correctly held inadmissible a statement by Mr. Garchar made in the hospital emergency room before the investigating police officer?
IV. Whether the $6,000,000 verdict is excessive?
V. Whether the trial court correctly held that $225,000 of the sums paid by the settling defendants could not be applied to reduce Mr. Garchar's judgment?
We conclude that reversible error has been demonstrated and remand for a new trial on liability. In view of this remand, it is necessary for us to consider and rule upon all issues presented.

I.
As to Point I, we agree with appellant that there is no duty required of a public authority to provide a crashworthy median strip; however, this is simply not the issue presented in this case. The plaintiffs' theory of liability against the City was not that the City had failed to provide a crashworthy median strip. Instead, plaintiffs allege that the City had assumed the care and control of the median strip and roadway and that the boulder placed at the head of the median strip constituted an intentionally placed hazard or trap. They further alleged that: (1) the road had been improperly designed, built and maintained so that vehicular traffic was channelled or led into the median strip; (2) the City knew this and therefore, together with the developer, (Leadership), was responsible for the boulder being placed in a position so that cars would either hit the boulder or (if they saw it) avoid the boulder and also avoid the median strip; (3) the boulder was meant to be a barrier rather than a step in beautification; (4) the City officials knew the boulder was dangerous because they knew its purpose; and (5) the danger had even been discussed at public City meetings.
We find ample evidence supporting the plaintiffs' theory of liability as enunciated above. The roadway where the accident happened was a divided highway with a grass median strip in the middle. Although wide enough for two lanes plus a turn lane, there were in fact no traffic or turn lanes marked. The boulder was located at the head of the median strip where an approaching turn lane abruptly ended. There was no road at this break in the median and no need for that turn lane which was unmarked. The roadway was initially built by the County and the area later annexed into the City. From the time of annexation the City exercised control over the roadway and the median strips. The City placed street lights in the area and installed stop signs. The City roped off and barricaded certain areas of the median strips to keep traffic off. The boulder was placed there for the same purpose. A City ordinance controlled the creation of breaks in the median strip and required a City permit for the creation of a break. A City ordinance also prohibited parking or driving on the medians. The City Director of Public Safety assumed responsibility for safety evaluation of the medians and under his direction City employees removed and trimmed bushes and trees in the median which were felt to constitute hazards to traffic. The City mowed and maintained the medians and entered into a contract with the developer Leadership for beautification of the medians. A City "beautification" committee supervised the beautification project which included safety considerations.
After the landscaping was completed, the City refused to accept certain portions and a dispute occurred between the City and the developer concerning areas where vehicular encroachment had damaged grass and shrubbery on the medians. At the site of the accident, cars routinely ran off the edge of the road onto the median preventing grass from growing along a narrow strip. Because of its dispute with the developer, the City refused to resume maintenance of this particular area. To expedite City approval *893 and take-over of maintenance, the developer placed large boulders where the damaged grass indicated motorists often strayed. The City beautification committee was aware of the boulders and reported to the City Manager and City Council that they were dangerous to motorists. The City's consulting engineer recognized the hazard to vehicular safety and reported such to the City Manager. At trial the Director of Public Safety testified he was aware that the boulders were placed at the ends of the medians where there were no lane markings on the road. The dispute between City and developer continued and for several months preceding the accident, neither the City nor the developer was caring for the accident site. The boulder remained in its hazardous position at the head of the abruptly widened median.
There was evidence that the road had been improperly designed and maintained. The misdesign had the effect of channelling vehicular traffic onto the median strip.[2] In view of the road configuration, cars continually ran over the median strip damaging the grass. To protect the grass the boulder was installed. As we indicated earlier, there was clear evidence from which the jury could have found that the City knew and appreciated the extent of the danger. Indeed, this was arguably the intentional creation of a dangerous condition rather than a mere negligent act.
It is clear that governmental entities may have a duty to exercise reasonable care to maintain travelled portions of highways in a safe condition. Gordon v. City of West Palm Beach, 321 So.2d 78 (Fla. 4th DCA 1975). Appellant relies upon City of Tallahassee v. Coles, 148 Fla. 606, 4 So.2d 874 (1941); City of Miami Beach v. Quinn, 149 Fla. 326, 5 So.2d 593 (1942); City of Fort Lauderdale v. Duchine, 70 So.2d 897 (Fla. 1954), and other similar cases holding that a City owes no duty to provide pedestrians with reasonably safe parkways and roadways. Appellant reasons that if a median strip need not be made safe to walk upon, then it surely need not be made safe to drive upon. This leads to appellant's first point on appeal asserting the non-existence of any duty to provide crashworthy areas adjacent to roadways. Such cases are simply not applicable where, as here, the City knew that due to misdesign and improper maintenance, cars were being channelled into driving over the median.[3]
Various Florida cases have imposed liability on governmental entities for hazardous conditions adjacent to paved roadways. In Town of Palm Beach v. Hovey, 115 Fla. 644, 155 So. 808 (1934), a deep hole was located several feet beyond the deadend termination of a street. A plaintiff was injured because of this condition and the Supreme Court stated at page 810:
Whether a place in or near a street where an injury occurred required a guard or barrier for the protection of travellers and whether a municipal corporation was guilty of negligence in constructing such a barrier are ordinarily questions for a jury in an action against the municipality for injury resulting from a defect in a street.
Other roadside hazards have included a canal adjacent to a T-intersection, a substantial dropoff from the paved surface to the unpaved portion adjacent to that surface, and a large pit two or three feet away from the paved portion of the roadway. See City of Hialeah v. Revels, 123 So.2d 400 (Fla. 3d DCA 1960); State of Florida, Department of Transportation v. Manning, 288 So.2d 289 (Fla. 2d DCA 1974); Brinson v. City of *894 Mulberry, 104 Fla. 248, 139 So. 792 (1932). Clearly, a general duty on the part of a municipality does exist with respect to roadside hazards. Trumpe v. City of Coral Springs, 326 So.2d 192 (Fla. 4th DCA 1976), cert. denied, 336 So.2d 599 (Fla. 1976).
Appellant also argues that the street in question had actually been constructed by the County and relies upon Nobles v. City of Jacksonville, 265 So.2d 550 (Fla. 1st DCA 1972); cert. denied, 272 So.2d 158 (Fla. 1973), and 316 So.2d 565 (Fla. 1st DCA 1975), contending it had no duty whatsoever concerning the roadway. Notwithstanding the technical duties and distinctions between county roads and city streets, it is clear that here the City assumed a duty to care for the area in question and had done so for a substantial period of time before the accident. Even if the City's actions were voluntary, they were, nonetheless, sufficient to entail responsibility. To briefly recapitulate, the City contracted with the developer to beautify the medians. The boulder was intentionally placed in the dangerous position it occupied at the time of the accident in furtherance of the beautification plan. The boulder was not itself a beautification item but was a barrier to protect grass.
Under all of the circumstances outlined above, we hold the trial court did not err in denying the City's motion for directed verdict on the liability issue. A jury question was presented on numerous factual matters and the appellant's crashworthy argument under this point is simply not applicable. The jury could and did find the City negligent in allowing the known dangerous condition to exist.

II.
In Point II appellant complains that the trial court erred in failing to instruct on: (1) Section 316.028, Florida Statutes (1973), regarding driving while intoxicated; (2) Section 316.090, Florida Statutes (1973), regarding driving on divided highways; and (3) Section 316.030, Florida Statutes (1973), regarding careless driving. Each of these statutes related to the issue of the plaintiffs' comparative negligence which the jury found to be 30%. The City points out that for each 1% of negligence, the amount payable under the $6,000,000 verdict would be reduced by some $60,000. We conclude that the trial court did not err in rejecting the requested charges on driving on divided highways and careless driving. We also conclude there was adequate evidence to necessitate a charge on driving while intoxicated and that denial of the city's requested charge on the statute was error requiring a new trial. A substantial amount of lay and expert testimony regarding intoxication was presented by both sides. Mr. Garchar had been attending a business meeting and spent several hours at a hospitality suite cocktail party. He admitted to having several drinks and his erratic driving prior to the accident showed clear signs of his impairment due to drinking or fatigue.[4]
Appellee does not argue on appeal that the charge on intoxication should not have been given. Indeed, appellee argued in favor of such a charge before the Circuit Court. Appellee takes the position, however, that counsel for the City withdrew his request for the charge on driving while intoxicated and thus waived his right to assert the absence of such a charge on appeal. We do not construe the record as a withdrawal or waiver of the instruction on driving while intoxicated. This view is buttressed by the stipulation of counsel at the conclusion of the charge conference which had the effect of preserving all objections to all requested instructions which were not given.[5]
*895 Notwithstanding the evidence of intoxication, the trial court denied the City's request to instruct on Section 316.028 as follows:

316.028 Driving while under the influence of alcoholic beverages, model glue, or controlled substances. 
(1) It is unlawful and punishable as provided in subsection (2) for any person who is under the influence of alcoholic beverages, model glue, or any substance controlled under chapter 893, when affected to the extent that his normal faculties are impaired, to drive or to be in the actual physical control of any vehicle within this state... .
The court also refused to give the standard jury instruction dealing with the negligence to be inferred from a statutory violation. The jury was therefore given no instructions whatsoever on either the statute or the effect of its violation. We find this failure to instruct to have been particularly prejudicial. The average man is probably aware that driving an automobile under the influence of alcohol to the extent his normal faculties are impaired is prohibited by law. The jury here was left to speculate about the effect of this law on their deliberations.
In denying the charge on the intoxication statute, the trial court expressly found there was no direct evidence of intoxication. In so ruling the court erred. A charge on the requested statute should have been given.[6]
This court's decision in Williams v. Groover, 244 So.2d 474 (Fla. 4th DCA 1970) is on point. There we stated as follows:
This was a negligence suit where the trial court refused, upon request, to charge the jury as concerns F.S. 1967, section 186.0177, F.S.A., which is entitled "Driving while under the influence of liquor or drug." The record reveals substantial competent evidence of a large consumption of alcoholic beverages by the operator of the motorcycle, the plaintiff, Groover, just prior to the collision in question. When the inferences arising from such consumption are coupled with the evidence of his conduct just before, during and after the collision, a jury question was presented and it was error for the trial court to refuse to charge on the mentioned statute. We reverse on authority of Selzer v. Grine, Fla. 1955, 79 So.2d 688, wherein it was stated,
"Whether or not a person is under the influence of intoxicating liquor to the extent that his or her normal faculties are impaired is a question of fact and should be determined by the jury when there is substantial evidence submitted on that question." (244 So.2d at 474-475).
All parties are entitled to adequate jury instructions upon their theory of the case when the evidence viewed in a favorable light substantially supports the theory even though it may be substantially controverted by evidence of the opposing party. Menard v. O'Malley, 327 So.2d 905 (Fla. 3d DCA 1976). The appellant was entitled to have the jury instructed in accordance with the law and the failure of the trial court to do so in accordance with the City's requested instruction was error requiring a new trial.

III.
Under this point, appellant contends the trial court erred in excluding a statement *896 made by the plaintiff shortly after the accident. This statement was made at the hospital and was overheard by the officer who investigated the accident, but it was not addressed to the officer nor made in response to any question, rather it was volunteered by Mr. Garchar to the physician attending him in the emergency room. At the time the conversation took place, relative to an earlier traffic infraction committed by the Plaintiff for which he was not detained or arrested, the officer had concluded his investigation of the accident in question, "had nothing more to gain" and was just "standing there as an ... interested bystander watching the emergency room procedures." We conclude that the trial court erred in relying upon Section 316.066, Florida Statutes (1973), formerly Section 317.171 in excluding this evidence. The factual setting under which the statement was made was not such as to bring the evidence within the confidential protection of information taken by the investigating officer for the purposes of making his accident report. State v. Mitchell, 245 So.2d 618 (Fla. 1971), and Hoffman v. Jackson's Minit Markets, Inc., 327 So.2d 48 (Fla. 4th DCA 1976). We do not rule on the admissibility of this evidence based upon other objections which might be made.

IV.
As to this point, appellant contends the $6,000,000 verdict was excessive and that the trial court erred in failing to set it aside. Strong arguments exist on the question of whether $6,000,000 is excessive under the facts herein. Much has been written regarding the review of verdict amounts, but few definitive rules have been enunciated by the courts. See Bould v. Touchette, 349 So.2d 1181 (Fla. 1977), and School Board of Palm Beach County, Inc. v. Taylor, 365 So.2d 1044 (Fla. 4th DCA 1978). Here, plaintiff's injuries are catastrophic and his capacity to enjoy anything approaching a normal life has been totally destroyed.
Six million dollars for an injury to an individual who remains alive and mentally competent represents the high point injury verdicts to date. Neither appellant nor appellee has directed us to any similar case where $6,000,000 has been sustained.[7] Nevertheless we decline to hold the verdict excessive. The plaintiff was 24 at the time of the accident, married, intent on starting a family, attractive, athletic and an IBM salesman, earning in excess of $25,000 per annum, on the way up the corporate ladder. Following the accident his condition is best described by quoting from his attorney's brief as follows:
It is impossible to describe the totality of the devastation to plaintiff by his injuries. After some eight months in the hospital with surgical procedures and endless hours of physical and occupational therapy, he has been left a permanent C5-6 quadriplegic. He is unable to walk or even sit upright and has only the most limited use of his upper extremities. He has no bowel or bladder control and is sexually impotent. He cannot even perspire below the neck.

*897 He is on continual medication, and prophylactic care is necessary to guard against respiratory or urinary tract infection and breakdown of skin tissue. He is unable to provide himself with the most elementary of daily care, such as bathing, shaving and other grooming, and cannot be left alone for any extended period of time. The future will be the same.
As would be expected, psychological testing and expert testimony in this cause demonstrated that these physical injuries have not been without their emotional toll. TOM lives in fear that his wife will abandon him and is degraded by his need for her assistance in the most intimate of bodily care. The two live a daily delicate emotional balance.
There were either introduced into evidence or described by various therapists and physicians who testified in this case a depressing array of mechanical paraphernalia that plaintiff must utilize in some grotesque approach at daily living, ranging from mechanical and pneumatic hand splints to catheters and diapers.
Under the circumstances we decline to find the amount excessive and this reversal is limited to a new trial on the issue of liability only.

V.
Under this last point appellant contends the court erred by denying a set-off of $225,000, which represents the excess of Mrs. Garchar's settlement over the jury's adjusted verdict for her. Appellant contends that this $225,000 amount should constitute a set-off against Mr. Garchar's judgment. Appellant attacks the $750,000 allocated to Mrs. Garchar in the settlement between her and the other defendants. Under the circumstances of this case, we conclude the trial court did not err in denying the set-off against Mr. Garchar's judgment. See Devlin v. McMannis, 231 So.2d 194 (Fla. 1970). If, on retrial, Mrs. Garchar receives a judgment in an amount below $750,000, because of reallocation of comparative negligence the difference shall not constitute a set-off against any award to her husband.
Based on the above, the final judgments below are reversed and the case remanded for a new trial on liability.
REVERSED AND REMANDED.
LETTS, C.J., and BERANEK, HERSEY, GLICKSTEIN and HURLEY, JJ., concur.[8]
DOWNEY, J., concurs specially with opinion.
ANSTEAD, J., concurs in part and dissents in part with opinion.
DOWNEY, Judge, concurring specially:
I have concurred in the decision to reverse the judgment appealed from for the reasons stated in the en banc per curiam decision.
However, I differ somewhat on the disposition of appellant's Point II, having to do with the trial court's refusal to give certain other instructions requested by appellant. Specifically, since this case must once again be tried on the issue of liability, I believe the trial court erred in refusing to give appellant's requested instruction on Section 316.090, Florida Statutes, having to do with driving on divided highways. Of course, if on retrial the court instructs the jury on Sections 316.028 and 316.090, then the court should also grant appellant's requested Standard Instructions 4.9 and 4.11, dealing with the effect of a statutory violation.
ANSTEAD, Judge, concurring in part and dissenting in part:
I differ with the majority opinion only on two points. I do not believe the trial court erred in excluding the statement allegedly *898 made by Mr. Garchar to a physician in the emergency room and I believe the trial court did err in refusing to give instructions on the statutes regarding careless driving and driving on divided highways. As to the latter I rely on the reasoning set out in the majority opinion as to the trial court's error in failing to instruct on the statute involving driving while intoxicated.
The record fully supports the trial court's ruling excluding Garchar's statement. The majority has ruled in essence that it was uncontradicted that the statement was volunteered to the physician attending Garchar and that the investigating police officer had concluded his investigation. Hence it is concluded that Section 316.066, Florida Statutes (1973) does not apply to protect the statement. I cannot agree with this view of the facts or law.
Garchar was taken to the emergency room immediately after the accident. His injuries are detailed in the majority opinion. While he was being treated by a physician in the emergency room a City of Tamarac police officer, dressed in civilian clothing, came in and questioned Garchar. As to the statement in issue on appeal the officer testified at one point:

He [Garchar] told me he had left and headed home, and he told me that he had been stopped by a Hollywood police officer for driving the wrong way down a highway, en route to his home, and the officer warned him and let him go.
Were you able to confirm this? [Question by attorney]
Well, confirm it, no. I do recall a subsequent conversation with the Doctor was in the emergency room, commenting something to the effect that it is too bad the officer didn't stop him and arrest him; it would have been the best favor he ever gave him, or something to that effect. We commented on this. I think Mr. Garchar agreed in some way with "Well, yes, that would have been a good thing, and here I am now." In his comments to me, other than that part, he didn't recall the accident. (Emphasis supplied)
It is true that the officer stated that in his opinion Garchar made the remark about wishing he had been detained by the police officer to the physician. But it is equally true that the statement was made by Garchar in one continuous episode after the officer had initiated a discussion about the events of the night and while the officer remained at Garchar's bedside. The officer never announced to Garchar or anyone else that the investigation had terminated. In fact, he conceded that it had not. It is true that the officer "felt" that his official questioning had ceased and that Garchar's statement had nothing to do with the officer's investigation, but I do not believe the trial court can be faulted for failing to draw such a fine line. This court has previously held that it is not enough for a police officer to subjectively determine, without informing the interviewee, that his accident investigation has ended. Elder v. Robert J. Ackerman, Inc., 362 So.2d 999 (Fla. 4th DCA 1978).
It is also important to note that no attempt was made to offer the testimony of the physician about the statement. Only the testimony of the Tamarac police officer was offered and that testimony was, at best, ambiguous, and, at worst, totally contradictory.
I do not contend that there is no conflict in the record on this issue. Rather, I simply believe that there is evidentiary support for the trial court's determination that the statement attributed to Garchar was elicited during the course of the police officer's investigation of the accident.
*899 
NOTES
[1] The jury verdict was in the form of special interrogatories whereby the jury determined the percentages of negligence, the total damages, and the reductions based on those percentages.
[2] The improper design related to the crown or slant of the road surface; the absence of lane markings; the tendency to steer or guide by the edge of the median strip which was narrow and then after the break suddenly widened causing traffic to generally stray onto the strip. There was also evidence of lighting deficiencies and other obscuring effects. A photographic exhibit is included as an appendix to this opinion.
[3] Although we do not base this decision on the alleged duty regarding crashworthy medians, it is clear that liability against governmental bodies for roadside hazards is a widely recognized area of law. See Annot., 52 A.L.R.2d 1403, Public Liability for Motor Vehicular Accidents as Affected by Condition of Road (1957).
[4] Immediately prior to the accident Mr. Garchar strayed from the proper portion of the highway and found himself in a barricaded construction area. There was also evidence that he had been stopped by a police officer shortly before the accident.
[5] At the conclusion of the charge conference, counsel for the City requested that they be allowed to "put our objections of record." When the City's counsel began listing specific objections, plaintiffs' counsel suggested an agreement that objections by all parties to any requested instruction which had not been given be preserved. The trial court elicited an agreement of all counsel that no one had waived any requested instruction and counsel for the City specifically stated that the requested instructions which had been denied were objected to.
[6] We find it unnecessary to decide the issue of the request by plaintiffs' counsel that the jury be instructed on the presumptions of intoxication provided in Section 322.262, Florida Statutes (1973). There was extensive argument on this request by plaintiff and strenuous objection by counsel for Leadership Housing Corp., a party not present in the case when submitted to the jury. The trial court disposed of all questions by simply ruling that intoxication was not a factual issue in the case. In doing so the trial judge never ruled on whether the jury should be informed of the statutory presumptions.
[7] In Hooks v. Washington Sheraton Corp., 578 F.2d 313 (D.C. Cir.1978), a jury awarded $6,000,000 to an 18-year old quadriplegic. The trial court required a remittitur to $4.5 million and the Court of Appeals affirmed $4.5 million as not excessive. In Rodriguez v. McDonnell Douglas Corp., 87 Cal. App.3d 626, 151 Cal. Rptr. 399 (1979), the court held an award of $4.2 million to a 22-year old workman rendered triplegic not excessive. The Rodriguez case is enlightening and specifically rejects the theory of comparing verdicts in different cases to determine excessiveness. While doing so, the Rodriguez opinion cites to Niles v. City of San Rafael, 42 Cal. App.3d 230, 116 Cal. Rptr. 733 (1974), wherein an award of slightly in excess of $4 million to an 11-year old quadriplegic was held not excessive. The Nevada Supreme Court in General Electric Company v. Bush, 88 Nev. 360, 498 P.2d 366 (1972), held a $3,000,000 verdict not excessive where the award was to a severely injured and totally paralyzed individual described as being among the class of the living dead. A Florida decision Talcott v. Holl, 224 So.2d 420 (Fla. 3d DCA 1969), affirmed an award of $1.5 million to a severely injured individual.
[8] Judge Moore did not participate in this decision and former Judge Cross is no longer a member of the Bench.