414 So.2d 544 (1982)
Lorenzo PEREZ, etc.; Alphonso Joa and Stonewall Insurance Company, Appellants,
v.
STATE of Florida DEPARTMENT OF TRANSPORTATION, Appellee.
No. AC-6.
District Court of Appeal of Florida, First District.
April 21, 1982.
Rehearing Denied June 15, 1982.
*545 Arnold R. Ginsberg of Horton, Perse & Ginsberg, Miami, and Grover, Ciment, Weinstein & Stauber, Miami Beach, for appellant Perez.
R. Benjamine Reid of Kimbrell, Hamann, Jennings, Womack, Carlson & Kniskern, Miami, for appellants Joa & Stonewall.
Jay O. Barber and Alan E. DeSerio, Tallahassee, for appellee.
THOMPSON, Judge.
This is an appeal from a final summary judgment entered in favor of the State of Florida, Department of Transportation (DOT) on complaints filed by Perez and Joa. We affirm.
Jose Perez was a passenger in a vehicle driven by appellant Joa on the McArthur Causeway. The Joa vehicle was traveling on a wet roadway in excess of the speed limit. Upon reaching the steel grating on the draw portion of the bridge, the vehicle suddenly made an abrupt right hand turn of nearly 90 degrees, crossed three lanes of traffic, struck the restraining curb and vaulted through the pedestrian handrail into Biscayne Bay. Perez was thrown from the car and drowned. Perez' parents sued Joa and DOT. Joa filed a third party complaint against the DOT. Based upon depositions and on the affidavits of DOT personnel in evidence, the court granted summary judgment in favor of DOT on the ground that the alleged acts fell within the "planning" exception to the waiver of sovereign immunity under § 768.28, Fla. Stat. (1975).
In their complaints, Perez and Joa alleged negligent design of the bridge, negligent maintenance of the bridge, and failure to warn of a dangerous condition.
The uncontroverted evidence in the record shows that the DOT adopted the American Association of State Highway Officials' (AASHO) standards for bridge design which included the specifications for the metal grating, and the curb-rail system. After reciting the four-step test set forth by the Supreme Court in Commercial Carrier Corporation v. Indian River County, 371 So.2d 1010 (Fla. 1979), the trial judge found that the design of the bridge fell within the planning exception to § 768.28, Fla. Stat. Although the appellants submitted some evidence that a better standard could have been adopted, the trial court found that this was "second guessing" of a governmental decision which Commercial Carrier intended to prevent. We agree.
The appellants have relied on a number of cases, particularly Ferla v. Metropolitan Dade County, 374 So.2d 64 (Fla. 3d DCA 1979), cert. denied, 385 So.2d 759 (Fla. 1980), as authority for the proposition that the *546 design of a bridge is not an act of planning but is an operational act and that the DOT is therefore not immune from liability. However, these cases merely hold that the facility in question cannot be negligently designed or negligently constructed. The steel grating lift span met AASHO requirements and the decision to use it was a design decision that met accepted standards existing at the time it was constructed. Unlike Ferla, there is no evidence in this record of negligent design of the bridge or any of its components. In the instant case, the design and construction of the bridge in accordance with the accepted standards promulgated by AASHO was an immune planning decision.
Appellants contend that the continued maintenance of the curb-rail system and the metal grating on the bridge was an operational activity so as to be actionable. Negligent maintenance is an actionable operational level activity. However, there is no evidence of negligent maintenance in this case. Appellants make it clear that they are not speaking of maintenance as the term is normally used but are speaking of maintenance in the sense of allowing a condition to exist.
It is contended that the DOT is guilty of negligent maintenance for failing to replace or modify the curb-rail system and the steel grating. A similar contention was made in Ferla where it was alleged that the traffic lanes on the causeway were too narrow. The Ferla court recognized that it was difficult to distinguish the question of the median strip design, which it had already decided was operational, and the fixing of the size of the roadway in question. The Ferla court took judicial notice that the solution to this problem could involve only the consolidation of the two heavily traveled traffic lanes into one or the construction of a new or additional bridge. Ferla held that this determination was a basic policy decision which would be the exercise of a planning level function from which the county was immune.
The upgrading or modification of structures to meet current standards is often of such magnitude as to constitute replacement or reconstruction. There are many roads and bridges in the State of Florida that were adequate for the amount of traffic and the size and speed of vehicles traveling on them when designed but which are not up to present standards. The modification or replacement of all of these roads and bridges involves the spending of many times the money available annually to the DOT for that purpose.
As was the case in Ferla it would require a major expenditure of funds to replace or modify the bridge as appellants contend should have been done. The evidence in this record shows that the bridge handled an average traffic flow of approximately 12 million vehicles per year and there had been apparently no prior accidents attributable to the steel grating. There was further evidence that there were numerous intersections and highways within the Dade County area that were more dangerous to the traveling public. It is the responsibility of DOT to expend the funds available for updating, improving or modifying existing facilities in a manner that is of the most benefit to the public. Their decision as to where and on which facilities these available funds are to be spent is a planning decision. If the appellants are correct in their contention, the state could easily be liable for more than 90% of the accidents occurring between Miami and Key West and yet it would probably require the entire budget of the DOT for several years to reconstruct the roads and bridges on that route to meet modern standards.
Furthermore, there is no evidence that the alleged negligent maintenance caused the accident. On the contrary, the only evidence as to causation is that the steel grating probably would not cause a vehicle to suddenly cross from the median to the outside curb at approximately a 90 degree angle. There is no evidence that a curb or handrail constructed to even higher than modern day standards would have prevented the vehicle from going off the bridge into the water. The DOT is not required to place impenetrable barriers along the sides of a bridge.
*547 The DOT's alleged negligence in failing to warn does not warrant further discussion in view of the numerous decisions holding that the selection and placement of traffic control devices are discretionary governmental planning functions and are therefore exceptions to the waiver of sovereign immunity under § 768.28, Fla. Stat. See Ferla.
AFFIRMED.
BOOTH, J., concurs.
ERVIN, J., dissents.
ERVIN, Judge, dissenting.
I respectfully disagree with the majority's conclusion that there was no genuine issue of material fact as to whether the continued maintenance of the curb-rail system and the metal grating on the bridge was an operational level activity. Nor do I believe the majority's reliance upon Ferla v. Metropolitan Dade Cty., 374 So.2d 64 (Fla. 3d DCA 1979), provides a useful test for identifying the levels of governmental activity. Ferla, on the one hand, held that Dade County's decision to design a median strip in a certain manner was an operational level function, commenting that the public entity's determination of its configuration "does not differ from the activity involved in properly maintaining already installed traffic control devices," id. at 67; yet, it also held that the entity's decision not to widen traffic lanes, nor to reduce speed limits necessarily involved the exercise of discretion. In my judgment, such distinctions, and the reasons given for them, provide no practical assistance to either the bench or the bar in determining whether the claimed act of negligence was operational or discretionary action. As I will endeavor to explain, if the test iterated in Johnson v. State, 69 Cal.2d 782, 73 Cal. Rptr. 240, 447 P.2d 352 (1968), and adopted by the Florida Supreme Court in Commercial Carrier Corp. v. Indian River Cty., 371 So.2d 1010, 1022 (Fla. 1979), as a means of identifying the functions, had been observed by Ferla and the majority here, all the activities at issue could, under the circumstances delineated in Johnson, be characterized as operational. Because that test has often been ignored by Florida appellate court decisions, I think it now requires careful scrutiny.
Johnson explains that only those basic policy decisions which have been committed to coordinate branches of the government are immunized from judicial review; that a basic policy decision must be a considered one, i.e., one made by the public entity's conscious balancing of risks and advantages, Johnson v. State, supra, 73 Cal. Rptr. at 249, 447 P.2d at 361, n. 8; that the burden of demonstrating whether the decision is considered rests on the governmental body, not the injured plaintiff. Finally, Johnson holds that although the initial decision  if "considered"  to act or not to act may not be subjected to tort liability, once subsequent facts are revealed placing the public entity on notice of certain dangers attending its decision, a duty arises requiring the agency to carry out its decision in a non-negligent manner. To summarize: if the challenged act is either not "considered," as defined by Johnson, or "considered" but followed by a change of condition producing a dangerous condition known to the public entity, the act is deemed to be nondiscretionary.
The situation in Johnson provides a suitable benchmark. There, the original decision of the California Youth Authority to release a youthful offender was held to be one made in the exercise of discretion, and therefore immune; but, in carrying out the decision, not only to release the youth, but to place him in a foster home, once the Authority had knowledge of the parolee's propensity for violence, it was under a duty to advise the intended foster parents of such facts, and the failure to do so rendered it subject to an action in negligence. The court made the following observations:
Once an official reaches the decision to parole to a given family, however, the determination as to whether to warn the foster parents of latent dangers facing them presents no such reasons for immunity; to the extent that a parole officer *548 consciously considers pros and cons in deciding what information, if any, should be given, he makes such a determination at the lowest, ministerial rung of official action. Judicial abstinence from ruling upon whether negligence contributed to this decision would therefore be unjustified; coupled with the administrative laxness that caused the loss in the first instance, it would only result in the failure of governmental institutions to serve the injured individual.
73 Cal. Rptr. at 250, 447 P.2d at 362 (e.s.). The court continued:
[N]ot only does the officer's decision as to warnings fail to rise to the level of governmental decisions calling for judicial restraint, but also the state failed to prove that the officer consciously considered the risks to plaintiff and determined that other policies justified them... . In fact, to the contrary, this is a classic case for the imposition of tort liability. Defendant failed to warn plaintiff of a foreseeable, latent danger, and this failure led to plaintiff's injury from precisely the expected source; courts encounter this type of allegation daily and are well suited to resolve its validity under traditional tort doctrine.
73 Cal. Rptr. at 241, 447 P.2d at 363.
The Johnson analysis was applied by a more recent California case, Baldwin v. State, 6 Cal.3d 424, 99 Cal. Rptr. 145, 491 P.2d 1121 (1972), to a question involving whether design immunity, once having attached, is perpetually effective regardless of any subsequent change in circumstances of which the public entity had notice. The court unequivocally replied that the governmental entity was entitled to immunity only so long as conditions had not changed. It continued:
Having approved the plan or design, the governmental entity may not, ostrichlike, hide its head in the blueprints, blithely ignoring the actual operation of the plan. Once the entity has notice that the plan or design, under changed physical conditions, has produced a dangerous condition of public property, it must act reasonably to correct or alleviate the hazard.
99 Cal. Rptr. at 151, 491 P.2d at 1127. It encapsulated its holding with the following words:
[W]here a plan or design of a construction of, or improvement to, public property, although shown to have been reasonably approved in advance or prepared in conformity with standards previously so approved, as being safe, nevertheless in its actual operation under changed physical conditions produces a dangerous condition of public property and causes injury, the public entity does not retain the statutory immunity from liability... .
99 Cal. Rptr. at 148-49, 491 P.2d at 1130-31. See also Ducey v. Argo Sales Co., 25 Cal.3d 707, 159 Cal. Rptr. 835, 602 P.2d 755 (1979) (failure of state to erect median barrier after state had notice of highway's dangerous condition subjected the state to an action in negligence).
Without citing the above California authorities, the Second District Court of Appeal similarly determined that an agency was not immune from liability in Savignac v. Dept. of Transportation, 406 So.2d 1143 (Fla. 2d DCA 1981), and reversed a summary judgment in favor of the Department on facts showing that the plaintiff suffered severe injuries after diving from a bridge into shallow water whose banks had been shoaled by a contractor under the direction of the Department. The court held that the Department could be subjected to liability for its failure to erect signs warning the public of the latent danger after it was provided notice that persons had previously dived from the bridge into the general area where dredging was conducted. Under the circumstances involved, the court concluded that the agency's standard of care should be no different than that owed by a trespasser to a landowner, i.e., to exercise reasonable care and caution to avoid injuring the trespasser once the landowner had discovered the peril. To the same effect, see City of Tamarac v. Garchar, 398 So.2d 889 (Fla. 4th DCA 1981) (a duty was placed upon the city to provide crashworthy areas adjacent to a *549 roadway once the city had notice of the roadway's dangerous configuration).
In applying the Johnson analysis to the facts before us, I would agree DOT has met its burden of showing that its initial decision to build the Mathews Causeway Bridge in 1957 was a considered one; that there was a conscious balancing of alternatives in reaching its decision, since DOT designed the bridge in compliance with the minimum standards recommended by the American Association of State Highway Officials. There were no facts presented revealing that the bridge was originally designed in a reckless disregard of the public safety, nor were there any facts showing that DOT was then aware of any latent dangers attending the design. If this were the only evidence before us, I could readily agree with the majority that the summary judgment should be affirmed. Appellant's case does not, however, rest solely upon a policy decision made in 1957. Appellants also alleged that DOT had negligently failed to repair or remedy the bridge's known hazards, and had failed to warn the public of them. Appellants supported their allegations with evidence showing, as the trial court's order reflected, that DOT's assistant maintenance engineer was aware that the steel grating on the bridge had become "travel polished" after 20 years' use, and consequently provided less traction to passing vehicles than asphalt when wet. By focusing on that segment of the evidence alone, one does not even need to reach the obsolescent-design theory refined in Baldwin and Ducey, because here pure maintenance activity is involved, i.e., the condition of the road had fallen below the original design standards. In my view, the state's failure to maintain a bridge that has become "travel polished" does not materially differ with the level of decision-making arising from the "proper maintenance of a traffic sign" which had been knocked to the ground, or the "proper maintenance of painted letters `STOP' on the highway" which had become worn and faded through the passage of time. See Commercial Carrier Corp., supra, 371 So.2d at 1022.
The rule in Baldwin and Ducey also has applicability to the following facts: There was evidence before the court revealing that DOT's engineers had known for several years preceding the accident of October 19, 1975, that the curb, the handrail, and the metal grating on the bridge had fallen below reasonable engineering safety standards. As a matter of fact, DOT had, in either late 1974 or early 1975, placed the curb-rail configuration of the bridge on its list of hazardous conditions requiring correction, and had requested funding from the Federal Highway Administration in an effort to remedy the known defects, but both requests were denied. Despite the denial, DOT was not without other options available to it. It could, at considerable less expense than resurfacing the bridge, have erected stronger guardrails, or, at the very minimum, placed traffic signs before the bridge warning passing motorists of the bridge's dangers under wet conditions; yet it elected to do nothing.
Notwithstanding the majority's reliance on Ferla, holding that a public entity's failure to warn was a determination made at the discretionary level, a number of more recent appellate opinions have held that such decisions are made at the operational level. See, e.g., Neilson v. City of Tampa, 400 So.2d 799 (Fla. 2d DCA 1981) (a decision to design an allegedly dangerous intersection not adequately controlled with traffic control signs); Dept. of Transp. v. Webb, 409 So.2d 1061 (Fla. 1st DCA, 1981) (a decision not to install additional warning devices at a railroad crossing); Savignac v. Dept. of Transportation, supra.
The Johnson court's observations apply with equal force to the instant case. This is a classic case for the imposition of tort liability. The Department failed to correct or to warn the public of a foreseeable, latent danger of which it had been aware for a sufficient length of time before the accident. Under the circumstances, the Department had no discretion in deciding whether or not to act. It was required to act. And because of its failure to act, it should now answer as any other defendant to an action exposing it to tort liability.
*550 Because I am convinced that genuine issues of material fact remain unresolved, I would reverse the summary judgment and remand the case for proceedings consistent with the views expressed in this dissent.