419 So.2d 640 (1982)
John Frederick HARRISON, As Personal Representative of the Estate of Frederick Coley Harrison, Deceased, Appellant,
v.
ESCAMBIA COUNTY SCHOOL BOARD, a political subdivision of the State of Florida, Appellee.
No. UU-294.
District Court of Appeal of Florida, First District.
June 23, 1982.
Rehearing Denied August 23, 1982.
*641 William C. Owen, of McClure, Wigginton, Owen & Maynard, Tallahassee, for appellant.
Robert W. Kievit, Pensacola, for appellee.
LARRY G. SMITH, Judge.
The issue in this case is whether sovereign immunity bars appellant's negligence action against the School Board. The trial judge ruled that it did, and dismissed appellant's complaint seeking damages for the death of his eleven-year old child who was struck by an automobile while enroute to catch a school bus at an allegedly negligently located school bus stop. Appellant maintains that this ruling was in error under the holding of Commercial Carrier Corporation v. Indian River County, 371 So.2d 1010 (Fla. 1979), and related cases, because the actions of the School Board, in negligently selecting "the most reasonably safe locations available" for school bus stops (and failure to provide adequate warning signs for motorists) as directed by Section 234.112, Florida Statutes (1977),[1] constituted an "operational," not "planning" function, and its actions were therefore not protected under the "`discretionary' governmental function" exception to the sovereign immunity waiver statute, Section 768.28, Florida Statutes (1977), as announced by the court in Commercial Carrier. Our review leads us to the conclusion that the trial judge ruled correctly, and we affirm.
According to the complaint, the deceased child was struck and killed by an automobile[2] as the child was proceeding along the East side of Road C-95A (Old Palafox Highway) in a northerly direction in the company of other children enroute to a school bus stop located at the intersection of *642 C-95A and Candy Lane Road.[3] The complaint alleged that the school board was under a duty, in connection with the operation of a school bus transportation system, to designate and operate safe school bus routes and bus stops, and that the board's duty included, specifically, the requirement under Section 234.112, Florida Statutes (1977), that it establish school bus stops as necessary "at the most reasonably safe locations available." The complaint further alleged that unusual traffic hazards existed at the bus stop location, and that by the board's failure to place a sign warning motorists of the bus stop location, it further violated the provisions of Section 234.112.[4] It is further alleged that the board knew or should have known that its designated school bus stop at that intersection was attended by unusual traffic hazards which created a dangerous condition for children approaching or congregating in its vicinity while waiting for a school bus, and that the board was negligent in failing to take appropriate measures to warn motorists of the bus stop location so as to mitigate such dangerous condition, or in the alternative, to arrange a safer location for the school bus stop. Paragraph 9 of the count against the school board sets forth the facts under which the accident occurred as follows:
9. At about 8:30 a.m. on November 10, 1977, Frederick Coley Harrison, together with two other children, who were students in the Escambia County School system, were enroute to the school bus stop located, maintained and operated by the defendant School Board at the intersection of Candy Lane Road and C-95A, Escambia County, Florida, for the purpose of boarding the school bus designated for their respective schools. In order to reach said school bus location, plaintiff's decedent found it necessary to travel along the perimeter of C-95A in a northerly direction. At the aforementioned time and place, Frederick Coley Harrison was struck and killed by an automobile operated along C-95A in a northerly direction. The death of Frederick Coley Harrison, deceased, was directly and proximately caused by the negligence of defendant School Board as herein alleged.
The gravamen of the complaint is that the county negligently decided to locate the school bus stop on one street rather than another, and negligently failed to post *643 warning signs. We must determine, under Commercial Carrier, whether this is the kind of governmental action that is "subject to scrutiny by judge or jury" as to the wisdom of the performance (Commercial Carrier, 371 So.2d at 1022), and which will subject the school board to tort liability if "careless conduct contributed to the governmental decision," Commercial Carrier, at page 1021, quoting from Johnson v. State, 69 Cal.2d 782, 73 Cal. Rptr. 240, 447 P.2d 352 (1968).
In compliance with Commercial Carrier's suggestion we turn first to the four-part preliminary test for identifying "discretionary" governmental functions stated in Evangelical United Brethren Church v. State, 67 Wash.2d 246, 407 P.2d 440, (1965).[5] First, does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? We answer this question in the affirmative. Section 234.01, Florida Statutes, makes it clear that transportation of school children furthers the basic governmental policy, program, or objective of making available to all school children "adequate educational facilities and opportunities which otherwise would not be available... ."
Secondly, is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? This question may be answered in the negative, in that the "realization or accomplishment" of the purposes of the transportation program itself is not dependent upon the precise location of any particular school bus stop, nor the exact placement of warning signs for motorists. Cf. Bellavance v. State, supra, footnote 5. Of course, when viewed as a part of the overall transportation plan, the location of school bus stops is an essential part of the program.
Third, does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? We answer this question in the affirmative. Locating school bus stops would normally entail an evaluation of and the making of judgmental decisions regarding innumerable factors, such as the number of stops, their relation to other scheduled bus stops, the number of pupils to be served at each location, the convenience to the children of the locations selected, the extent to which the particular bus stop locations might affect desirable bus routing, traffic conditions, and the availability and suitability of alternate locations. Appellant concedes the affirmative answer to this question, to a limited extent. Appellant agrees that at least the initial decision as to whether a school bus stop is necessary for a particular area can logically be characterized as a policy or planning level decision. Appellant agrees that in making such a decision the school board presumably would have to balance the feasibility of such locations, and its capacity to provide the required service, against the demand for the bus service. Appellant urges, however, that once the board affirmatively decides that a bus stop is necessary, the board is no longer free, in the exercise of unfettered discretion, to place the bus stop at any particular location desired. Appellant insists that the statute prescribing the placing of bus stops at "the most reasonably safe locations available" preempts any further action by the board rising to the level of a policy, planning or judgmental decision. Although appellant does not undertake an analysis based upon these four questions, the main thrust of appellant's argument focuses on issues raised by this third question, and we therefore will address it more fully in the discussion of the legal authorities relied upon by the parties.
Fourth, does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or *644 decision? The answer to this question is unequivocally in the affirmative.
According to the Evangelical United Brethren Church case, if one or more of the stated questions call for or suggest a negative answer, then further inquiry may well become necessary, depending upon the facts and circumstances involved. Since under our analysis question two may receive a negative answer, and in view of appellant's emphasis on the third question, we acknowledge the need for further inquiry. The analysis in Johnson v. State, supra, adopted by the court in Commercial Carrier, distinguishes between the "planning" and "operational" levels of decision-making. From Johnson we learn that that court's analysis is predicated primarily upon "policy considerations" (see Commercial Carrier, supra, 371 So.2d at 1021); that it may not be possible to set forth a definitive rule which will determine in every instance whether a governmental agency is liable for discretionary acts of its officials; but nevertheless, there are various factors which furnish a means of deciding whether the agency in a particular case "should have immunity," such as:
The importance to the public of the function involved, the extent to which government liability might impair free exercise of the function, and the availability to individuals affected of remedies other than tort suits for damages.
Lipman v. Brisbane Elementary School District, 55 Cal.2d 224, 11 Cal. Rptr. 97, 99, 359 P.2d 465, at 467, quoted in Johnson v. State, 447 P.2d at 357. Johnson also indicates to us that our "further inquiry" should concentrate "on the reasons for granting immunity to the governmental entity." This approach, said the court,
... requires us to find and isolate those areas of quasi-legislative policy making which are sufficiently sensitive to justify a blanket rule that courts will not entertain a tort action alleging that careless conduct contributed to the governmental decision. (447 P.2d at 360-361)
It appears to us that to require the school board to decide on school bus stop locations under the threat of tort liability in the event a judge or jury at some later date might determine that the chosen location constituted a safety hazard to an individual child injured enroute to it, would present some difficulties. It is obvious that some potential for injury to a child would exist at any location where motor vehicle traffic exists, yet it would be totally impracticable and indeed impossible to locate a bus stop at any place where this would not be true. Furthermore, a location deemed "most reasonably safe" for some could pose safety problems different both in kind and degree for other pupils, given the fact that they very likely approach the bus stop from different directions, and by different routes. Finally, one might easily conclude that the safety of each child could be insured to the utmost only by requiring the bus to stop at each child's home, yet it is equally apparent that this would be totally impracticable because of other factors, such as the length of time the children would be required to endure the bus ride, the potential for increased traffic congestion owing to excessive bus stops, and the increased hazards generated by the bus leaving and re-entering well-travelled routes, to name but a few.
We do not overlook the Johnson court's caveat that an employee's (or, we assume, an official's) concern over the potential liability of the governmental unit is no justification for "an expansive definition of `discretionary,'" and hence immune acts. We note also that court's observation that although it is unlikely that the possibility of government liability will be "a serious threat to the fearless exercise of judgment," nevertheless, to the extent that "such a deterrent effect takes hold," it may indeed be "wholesome." Johnson v. State, 447 P.2d at 359-360. This court has acknowledged, in fact, that "some inhibiting effect may well be healthy, ..." Bellavance v. State, supra, 390 So.2d at 425. Nevertheless, we think it is pertinent to consider the futility, as our discussion indicates, of trying to arrive at any consensus as to the exact policies, standards or criteria *645 that should govern any particular bus stop location. Attempts to do so, except on a very broad basis, would serve only to unduly burden the decision-making process. Thus, government liability for the board's selection of bus stop locations "might impair free exercise of the function, ..." (Lipman, 359 P.2d at 467).[6]
We think sufficient justification exists for a holding that the school board's function in selecting school bus stop sites is not one that should "be subject to scrutiny by judge or jury as to the wisdom of their performance," Commercial Carrier, 371 So.2d at 1022.
We turn now to the authorities cited by appellant in support of his argument that negligence derived from a violation of a statutory duty is not within the "planning" level of governmental decision-making recognized in Commercial Carrier. In support of this proposition appellant cites federal as well as Florida cases: Griffin v. United States, 500 F.2d 1059 (3rd Cir.1974); Barton v. United States, 609 F.2d 977 (10th Cir.1979); and A.L. Lewis Elementary School v. Metropolitan Dade County, 376 So.2d 32 (Fla. 3rd DCA 1979).[7] Upon examination we find that these cases are supportive of a rule considerably more limited than is assumed by appellant, and that they tend more to negate liability than to impose liability under the circumstances of the case before us.
Griffin v. United States, supra, involved a negligence claim against the United States based upon approval and release by the Division of Biological Standards of polio vaccine which allegedly did not conform to existing federal regulations and testing criteria required for its approval and release. Regulations and procedures required testing by injection of samples into live monkeys and approval only if 80% of the monkeys survived the test period; and they further required that the neurovirulence of the lot being tested could not exceed that of a reference strain as measured by certain criteria, including the number of animals showing lesions characteristic of polio virus infection; the number of animals showing lesions other than those characteristic of polio virus infections; the severity of the lesions; the degree of dissemination of the lesions; and the rate of occurrence of paralysis not attributable to the mechanical injury from innoculation trauma. The Division had tested the lot of vaccine from which plaintiff's injuries later resulted, and its test results showed that the neurovirulence of the vaccine had exceeded that of the reference strain. Despite the failure of the vaccine to conform to the required standards, the Division approved it for use based upon the possible "biological variation" which might occur from test to test. The Griffin court determined that there was no immunity under the "discretionary function" exception to the federal tort claims act. The court stated (500 F.2d at 1066, 1068-1069):
Where the conduct of Government employees in implementing agency regulations requires only performance of scientific evaluation and not the formulation of policy, we do not believe that the conduct is immunized from judicial review as a `discretionary function.' (Emphasis supplied)
* * * * * *

*646 ... The violation of a nondiscretionary command takes what otherwise might be characterized as a `discretionary function' outside the scope of the statutory exception... . Liability, in such cases, is predicated not on a negligent or unwise policy determination, but on the failure of Government employees to conform to and act consistently with the authority delegated.
Barton v. United States, supra, involved a claim for damages brought by a cattle rancher for the alleged unlawful acts of agents of the Bureau of Land Management in requiring temporary discontinuance of grazing on public lands despite existing grazing permits issued to the plaintiff. The Bureau had the authority, in the event of range depletion resulting from drought or other causes, to reduce grazing privileges in whole or in part, "for such period of time as may be necessary" (609 F.2d at 980). In finding that the action was barred under the "discretionary function" exception, the court stated (Id. at 980):
There are no fixed standards or guides by which the effect of drought on the range forage can be assessed for the purpose of determining whether grazing should be continued on public lands. It is wholly a matter of judgment of the BLM range officials and clearly within the discretionary exception of the Federal Tort Claims Act. (Emphasis supplied)
A.L. Lewis Elementary School v. Metropolitan Dade County, supra, involved the failure of the county to establish speed zones, and to install traffic and pedestrian control devices "for use on streets and highways surrounding all schools, public or private ...," pursuant to Section 316.1895, Florida Statutes (1975). In rejecting the defense of sovereign immunity, the court held that "express statutory direction" to install certain speed zones and traffic and pedestrian control devices at stated locations makes such governmental actions mandatory, and the question of whether or not such shall be installed is thereby removed from the realm of governmental discretion, (376 So.2d at 34).
We hold that the statutory directive requiring the board to establish school bus stops at the "most reasonably safe locations available" does not rise to the level of a "nondiscretionary command" (Griffin v. United States, at 1068), or a "fixed or readily ascertainable standard" (Barton v. United States, supra, at 979); nor an "express statutory direction" (A.L. Lewis Elementary School v. Metropolitan Dade County, supra, at 34). The statutory words "most reasonably safe locations available," unlike the statutes and regulations involved in the foregoing cases, have no fixed or readily ascertainable meaning to which the governmental authority can conform without necessity for the exercise of judgment, and the making of planning or policy decisions. We are unable to state, as appellant would have us do, that the legislative pronouncement in question preempts further "policy" considerations relevant to the functions addressed by the statute, so that the board is left with nothing but the "basic operational task of carrying out the statutorily decreed duty" (Appellant's Brief).
The statutory directives concerning the location of bus stops, as well as the provision for placement of warning signs "where unusual traffic hazards exist," can be characterized as nothing more than "generalized policy standards" which, as the court held in First National Bank in Albuquerque v. United States, 552 F.2d 370 (10th Cir.1977), cert. den., 434 U.S. 835, 98 S.Ct. 122, 54 L.Ed.2d 96 (1977), do not relieve the board of the necessity for making "policy judgments" (552 F.2d at 375, 376). In that case the issue was whether liability could be imposed upon the United States Department of Agriculture, based upon the contention that the Department had been negligent in failing to require labeling adequately warning of the possibility of food chain poisoning as a result of eating the meat of hogs which had been fed seed treated with a mercury fungicide. The court disposed of the contention that the statute and regulations presented specific standards such as those upon which liability in Griffin v. United States, supra, was predicated, stating (552 F.2d at 375, 376):

*647 Thus, the statute and the regulations staked out only generalized policy standards for the precautions, warnings and directions for use. To enforce these standards, and give content and meaning to them, the agency was required to make policy judgments in evaluating the adequacy of the labeling... . (Emphasis supplied)
The court further emphasized the distinction between such "generalized policy standards" and the specific regulations requiring scientific evaluation dealt with by the court in Griffin v. United States, supra, by observing (552 F.2d at 376, N. 17):
The Third Circuit's opinion pointed out the DBS function was not to determine if the lots of vaccine were safe for release, but instead was the duty to ascertain if specific neurovirulence standards of the regulation had been met. See 500 F.2d at 1066 N. 16A.
The Griffin case was similarly distinguished in Gray v. United States, 445 F. Supp. 337 (S.D.Tex. 1978), involving a claim that the Food and Drug Administration was negligent in failing to properly test a drug, failing to warn of its adverse affects, and in approving the drug and representing that it was safe. The statute and regulations required, in essence, that the drug not be approved unless it were found "safe for use" (445 F. Supp. at 339). No scientific tests or standards were specified, a factor which distinguished the case from Griffin v. United States. The Gray court went on to observe that the character of the statute and regulations requiring that a drug be "safe for use" was a direct indication of the discretionary nature of the acts demanded, and that compliance with such a statute or regulation requires judgment and discretion.
Having concluded that the statutory duties of the board under Section 234.112 contemplate "planning" rather than "operational" functions, we turn to the final issue, which is whether the board's failure, apart from any statutory directive, to place motorist's warning signs at school bus stop locations must be classified as "operational." Although appellant has cited no case holding that the failure to install a traffic control device or warning sign is a matter of law "operational," some cases decided subsequent to the submission of this case tend to support appellant's position,[8] while others, including those from this court, do not.[9] In its Commercial Carrier opinion the court refrained from expressing an opinion on this point (371 So.2d at 1022). We accordingly decide, based upon our analysis of the pertinent cases, that the decision to place or not to place traffic control or warning devices at a given school bus stop location involves policy making, planning or judgmental government functions, rather than operational.[10]
*648 We first note that A.L. Lewis Elementary School v. Metropolitan Dade County, supra, discussed earlier in this opinion, contains language which supports our decision in this case, although the court in that case arrived at a different result because of the existence of an express statutory direction requiring installation of traffic control devices at a specific place, namely, "streets and highways surrounding all schools ..." (376 So.2d at 34). However, the court's opinion states (376 So.2d at 34):
The appellees argue, and correctly so, that the fixing of particular traffic zones, installation of traffic signals and pedestrial control devices are discretionarily [sic] policy matters, planning or judgment governmental features, and as such cannot be the subject of traditional tort liability; ...
From the foregoing we gather that the Third District, if it adhered to the quoted language, would rule in accord with our decision in this case. Our conclusion in this regard is strengthened by reference to an earlier decision from the same court, Ferla v. Metropolitan Dade County, supra, footnote 8, in which the court held that the establishment of a speed limit and the fixing of the width of traffic lanes on a causeway were "planning" functions.[11] The Ferla opinion noted Commercial Carrier's citation, with approval, of Weiss v. Fote, 7 N.Y.2d 579, 200 N.Y.S.2d 409, 167 N.E.2d 63 (1960), a case which held that an injured pedestrian could not base a negligence claim against a city upon the ground that it had provided too short a "clearance interval" for the traffic light at the intersection where an accident occurred.
By contrast, we observe that the Third District in Welsh v. Metropolitan Dade County, 366 So.2d 518 (Fla. 3rd DCA 1979), determined that improper maintenance of county roads and streets is an "operational" function, as did the Fifth District in Wojtan v. Hernando County, 379 So.2d 198 (Fla. 5th DCA 1980), with respect to the maintenance of a county roadway and its shoulders. See also, cases cited in footnotes 8 and 9, supra.
Our answers to the Evangelical Brethren preliminary questions, when related to the warning sign issue, would be essentially the same as we have stated with respect to the function of locating the school bus stops. We conclude also, as we did in connection with the bus stops, that governmental liability for the decisions it makes in regard to the selection and location of traffic control devices or warnings "might impair free exercise of the function" (Lipman v. Brisbane Elementary School District, supra, quoted in Commercial Carrier, 371 So.2d at 1021). Although a traveler on the highways and streets would be exposed to near chaotic conditions if there were no controls whatever, of at least some (if not equal) concern is the fact that every traffic control device imposes a limitation or restriction upon freedom of travel, not to mention the expenditure of public funds required for installation and maintenance. Furthermore, governmental liability for failure to restrict, limit, or warn, would likely tend to force government officials to indulge in excessive utilization of traffic control mechanisms, thereby creating undue inconvenience *649 for the traveling public, as well as congestion and impairment of the free flow of traffic that would in turn tend to create its own special safety hazards, and other detrimental effects.[12] This is an area where uniquely governmental policy considerations must enter into the decision-making process, and it is definitely an instance in which more is not necessarily better.
In conclusion, with respect to the governmental decisions subjected to challenge in this case, we think it would be appropriate to observe, in harmony with the thought expressed by the court in Weiss v. Fote, supra, that there is no reason to prefer the verdict of a jury over the judgment of the governmental body charged with responsibility in such matters. This case, in our judgment, perhaps illuminates one of those "problem areas" spoken of by the court in Gray v. United States, supra (445 F. Supp. at 340):
... It is in those problem areas where the public imposes upon its decision makers both a duty and an unrestrained liberty to consider and construct a solution, that the results of such deliberations should be protected. Otherwise the threat of future litigation might intimidate the creativity of those decision makers burdened with the duty of working out a problem... .
It appears to us, therefore, subject to the limitations expressed in footnote 11, supra, that traffic planning and control decisions involve policy and judgmental considerations that generally remove them from the realm of "operational" functions.[13]
The judgment appealed is AFFIRMED.
SHIVERS, J., concurs.
ERVIN, J., dissents with opinion.
ERVIN, Judge, dissenting.
The majority's opinion addresses the unanswered question posed in Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010, 1022 (Fla. 1979), as to whether a governmental body can be exposed to liability for its failure to place traffic control devices at an intersection. The majority responds that as applied to the facts of this case, it cannot, and bases its answer primarily upon the four-factor test espoused in Evangelical United Brethren Church v. State, 67 Wash. 246, 407 P.2d 440 (1965), and commended by Commercial Carrier Corp. "as a useful tool for analysis." Id. at 1022. As I shall endeavor to explain, the Evangelical test is inapplicable to a case *650 such as this in which the specific, challenged act does not involve the exercise of discretion.
In my judgment, the majority's attempt to locate the line between an operational level function and one at the planning level is no more successful in producing a workable basis for analysis than have been the dozen or so efforts made by the various district courts of appeal in decisions post-dating Commercial Carrier Corp. For examples, we are told that the following acts of public entities are operational functions: a decision not to place a median strip at a certain location, Ferla v. Metropolitan Dade County, 374 So.2d 64 (Fla. 3d DCA 1979); a decision to design and install an allegedly dangerous storm sewer system, Collom v. City of St. Petersburg, 400 So.2d 507 (Fla. 2d DCA 1981); a decision to design an allegedly dangerous intersection not adequately controlled with traffic control signs, Neilson v. City of Tampa, 400 So.2d 799 (Fla. 2d DCA 1981); a decision not to install additional warning devices at a railroad crossing, Dept. of Transp. v. Webb, 409 So.2d 1061 (Fla. 1st DCA 1981); a decision not to place signs on bridge, warning divers of reduced depth of water, caused by agency, once agency became aware that bridge had been used for diving. Savignac v. Dept. of Transp., 406 So.2d 1143 (Fla. 2d DCA 1981); a decision to release an inmate committed pursuant to the Baker Act, Bellavance v. State, 390 So.2d 422 (Fla. 1st DCA 1980); a decision to provide an electrical system to the public, Griffin v. City of Quincy, 410 So.2d 170, (Fla. 1st DCA 1982). On the other hand, the following acts have been held discretionary: decisions to construct a road and a median with a certain configuration, and to fail to provide the intersection with adequate signalization, Ingham v. State Dept. of Transp., 399 So.2d 1028 (Fla. 1st DCA 1981), pet. for rev. docketed, no. 60,994 (Fla., orally argued March 4, 1982); a decision not to extend a road or to build a guardrail beside the road, Payne v. Palm Beach County, 395 So.2d 1267 (Fla. 4th DCA 1981); a decision to design improperly a certain intersection, Banta v. Rosier, 399 So.2d 444 (Fla. 5th DCA 1981); a decision whether or not to fix traffic zones, install traffic signals or pedestrian control signals, A.L. Lewis, etc. v. Metropolitan Dade Cty., 376 So.2d 32 (Fla. 3d DCA 1979); and a decision not to reduce the speed limit on a causeway, Ferla v. Metropolitan Dade Cty., supra.
No single, workable tool for identifying discretionary acts has as yet evolved from this malestrom of conflicting and seemingly irreconcilable opinions. If we are to avoid what Johnson v. State, 69 Cal.2d 782, 73 Cal. Rptr. 240, 447 P.2d 352, 357 (1968), described as "the semantic thicket of attempting to determine ... `where the ministerial and imperative duties end and the discretionary powers begin ..."; if we are to avoid the "mere labeling approach" that some commentators have leveled at the planning-operational dichotomy, see Note, The Discretionary Exception and Municipal Tort Liability: A Reappraisal, 52 Minn.L. Rev. 1047, 1062 (1968), we must be provided a better test for gauging the two levels of activity than has yet been fashioned by the opinions of the various districts post-dating Commercial Carrier Corp.; otherwise the Florida Supreme Court might be well advised to reconsider its decision adopting the discretionary-planning level test.[1] Although largely ignored, a workable, practicable basis of evaluation exists in the very case whose analysis Commercial Carrier Corp. adopted, Johnson v. State, supra.[2] Because of its specific adoption by our supreme court as a means of identifying discretionary "functions of coordinate branches of government," it is the Johnson analysis to which one's focus should be primarily *651 directed, rather than the "preliminary test"[3] of Evangelical, "commend[ed] ... as a useful tool for analysis." 371 So.2d at 1022. Due to the lack of consistency by the appellate courts in observing the proper distinctions, the Johnson analysis requires careful examination.
At the outset, it should be noted that Johnson cautions against casually decreeing governmental immunity; that where "`there is negligence, the rule is liability, immunity is the exception.'" Id. 447 P.2d at 363 (quoting from Muskopf v. Corning Hospital Dist., 55 Cal.2d 211, 219, 11 Cal. Rptr. 89, 94, 359 P.2d 457, 465 (1961), the first California opinion to abrogate sovereign immunity). Johnson next advises that although a governmental employee may engage in discretionary activity, such fact is not dispositive of the question if in a given case the employee did not render a "considered" decision. 447 P.2d at 361, n. 8. Only such decisions "`remain beyond the range of judicial inquiry.'" Id. at 360 (quoting from 3 Davis, Administrative Law Treatise, § 25.11, p. 484 (1958)). A considered decision is defined as one which consciously balances risks and advantages. 447 P.2d at 361, n. 8. And, since Johnson places the burden upon the state to make a showing that its discretion was exercised, "few cases", as one commentator has observed, "can be disposed of on demurrer by the governmental entity." D. Selmi, Discretionary Immunity in California in the Aftermath of Johnson v. State, 15 Santa Clara Lawyer 454, 463 (1975). To the same effect, see also Elton v. County of Orange, 3 Cal. App.3d 1053, 84 Cal. Rptr. 27 (1970). Finally, although the public body's decision to take certain action may have been made at the planning level, and therefore immune, Johnson clearly states that the attachment of immunity to the original decision does not immunize in perpetuity any subsequent negligent acts made by the governmental body in carrying out the plan.
A later California case representing an outstanding example of the application of the Johnson analysis to an issue involving the purported negligent design of a highway intersection is Baldwin v. State, 6 Cal.3d 424, 99 Cal. Rptr. 145, 491 P.2d 1121 (1972). There, summary judgment in favor of the state was reversed on facts showing that plaintiff-motorist had sustained severe injuries when he attempted to make a left turn onto a street which intersected at right angles the highway that he had been traveling. Because the highway had no special left turn at the intersection, the motorist stopped his vehicle in the pass lane of the four-lane highway, and while stopped was struck from the rear by another vehicle, resulting in his automobile being propelled into on-coming traffic and hit head-on by another vehicle.
In his action against the state, plaintiff contended that the intersection constituted a dangerous condition because of the absence of a left turn lane, the heavy traffic and the high speeds on the highway. While conceding that the state had demonstrated the initial application of the design-immunity defense since it had constructed the intersection in accordance with the plan or design approved in advance by an officer exercising discretionary authority, the court held that the public entity cannot retain in perpetuity its statutory immunity from liability where the constructed public property in its actual operation, and under changed *652 physical conditions, produces hazards to the traveling public. Plaintiff's evidence on that point revealed the state had been aware, for some time since the construction of the intersection, that a number of similar accidents had occurred at the same intersection; that the injury-fatality rate for collisions at the location was double the rate for the remainder of the city, and that the erection of a physical barrier or traffic control signals could have alleviated the danger. After considering these facts the court concluded that the state's design immunity persists only so long as conditions have not changed, but once
having approved the plan or design, the governmental entity may not, ostrich-like hide its head in the blueprints, blithely ignoring the actual operation of the plan. Once the entity has notice that the plan or design, under changed physical conditions, has produced a dangerous condition of public property, it must act reasonably to correct or alleviate the hazard.
491 P.2d at 1127.
Like its earlier opinion in Johnson, the court held that the failure of the public entity, under such circumstances, to take any overt steps to remedy the hazard was not an immune decision made at the planning level. To the same effect, see also Ducey v. Argo Sales Co., 25 Cal.3d 707, 159 Cal. Rptr. 835, 602 P.2d 755 (1979) (failure of state to erect median barrier held actionable).
I think it possible to draw some rather broad generalizations from Johnson and the later California opinions following it. Before it may be said that a public entity has discretionary authority to act, there must in the first instance be a specific grant of legislative power to a governmental agency so authorizing it. In the case before it, Johnson observed that the "[l]egislature ... granted to the [agency] the power to weigh potential risks and benefits and to establish standards ..." 447 P.2d at 361. If, however, the legislature retained rather than delegated the power to the agency to make certain policy decisions, it is probable that Johnson would hold there is no discretion, hence no immunity. This was in fact the holding of a later California Supreme Court opinion. See Ramos v. County of Madera, 4 Cal.3d 685, 94 Cal. Rptr. 421, 484 P.2d 93, 100 (1971). Such an approach is consistent with federal cases interpreting the discretionary function exception to the United States Tort Claims Act, holding that no discretion is involved when governmental officials are operating under mandatory statutes or regulations which they have a legal duty to observe.[4]Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); Downs v. United States, 522 F.2d 990, 996-997 (6th Cir.1975); Griffin v. United States, 500 F.2d 1059, 1066 (3d Cir.1974). See also Hollis v. School Bd. of Leon County, 384 So.2d 661, 665 (Fla. 1st DCA 1980).
Additionally, because Johnson defines a considered decision as one involving a conscious "balancing [of] risks and advantages," 447 P.2d at 361, n. 8, it is highly unlikely that Johnson would sustain any argument that a decision made in reckless disregard of a known risk was considered. By analogy, many out-of-state jurisdictions recognize as an exception to immunity the rule that if the fault in the plan or design is so great or manifest, the plan is regarded as obviously or inherently dangerous, and therefore one involving no discretion. Dodds v. West Liberty, 225 Iowa 506, 281 N.W. 476 (1938); Gould v. Topeka, 32 Kan. 485, 4 P. 822 (1884); Donnelly v. Ives, 159 Conn. 163, 268 A.2d 406 (1970); Paul v. Faricy, 228 Minn. 264, 37 N.W.2d 427 (1949).
*653 Once, however, the governmental body has met its burden of showing that the decision was considered, the immunity attaches not only to the original plan, but also to any construction carried out in precise conformity with the plan,[5] but not, however, to the negligent construction of a project implementing the plan in circumstances where the construction work is under the control of the public authority. Cf. Seaboard Coastline R. Co. v. United States, 473 F.2d 714 (5th Cir.1973). The immunity conferred does not necessarily remain in perpetuity; before it may be dissipated, however, the plaintiff must present facts showing a change of conditions subsequent to the creation of the plan which placed the governmental entity on notice that its project was attended with dangers.[6] Under such circumstances, the failure of the agency to act involves no discretion; consequently there is no substitution by the judiciary of an alternative which it deems more reasonable than that designed by the agency.
Additionally, I think it safe to say that it is only in those cases in which there is some evidence revealing the exercise of a "considered" decision, as defined by Johnson, that reference to the preliminary test advanced in the Evangelical case is necessary in order to determine whether the decision was "truly discretionary." See note 3, supra. If the circumstances do not reveal a considered decision, or, alternatively, if the original decision to act was the result of discretion, but the specific challenged act involves no discretion because of changed conditions, reference to the preliminary test becomes unnecessary.
With the Johnson analysis clearly in mind, one may avoid the temptation to label the functions of governmental activity indiscriminately; to assume, for example, that although the maintenance of traffic control signals in place is an operational level activity, yet to conclude that a decision not to install them is necessarily one made at the planning level. Under the circumstances delineated in Johnson, both activities may fall within the operational level of government decision-making; so also may a decision not to alleviate known hazards attending the configuration of an intersection, a bridge, or  as is alleged in this case  the location of a school bus stop.
In applying the Johnson analysis to the facts alleged in the complaint before us, I am of the firm belief that the complaint sufficiently states a cause of action. Appellants alleged that "the defendant school board violated Section 234.112, Fla. Stat. (1977), in that said school bus stop was not designated at the most reasonable safe location available in the vicinity." It should be *654 remembered that one moving to dismiss a complaint accepts as true all well-pleaded allegations. I therefore think it impossible to state on this record that the designation of the school bus stop by the board was, as required by Johnson, a considered one. For example, we know nothing from this record concerning how the board arrived at its decision to designate the stop at the particular locality; whether it considered alternative locations; whether it reached its decision in disregard of a known risk. Moreover, since Johnson places the burden on the governmental body to produce such evidence, this case should not at the pleading stage  given the allegations before us  be disposed of by an order of dismissal.[7]
The absence of a record reflecting whether the governmental entity's decision to release an inmate from a state mental institution motivated this court to reverse a summary judgment holding the agency's decision to be discretionary. In Bellavance v. State, supra, we quoted with approval Johnson v. State's requirement that the state must make a showing that its decision was made only after it "consciously balanced risks and advantages." We specifically noted that "the State had not demonstrated that the personnel involved, after consciously balancing risks and advantages, made a considered decision in releasing Riccardelli [the inmate]." Id. 390 So.2d at 425. Because of the same failure in proof by the school district in the case at bar, the order of dismissal should be reversed.
Even if it were determined that the decision of the school board to place the bus stop at the specific location was, under the Johnson analysis, a considered one since Section 234.112 ostensibly vests discretion in the district school boards to determine school bus stops "at the most reasonably safe locations available ...", it is my belief that the other allegations of the complaint sufficiently alleged that the board was subsequently negligent by its failure to request the DOT to place a sign near the school bus stop warning motorists of its location after the board became aware that its designated location was fraught with dangers. Appellant specifically alleged that
as of November 10, 1977 [the date of the accident], the defendant school board knew or should have known that its designated school bus stop ... was attended by unusual traffic hazards which created a dangerous condition for the children approaching or congregating in the vicinity of the school bus stop in anticipation of being picked up by school busses operated by the school board.
It was further alleged that the board "was negligent in failing to take appropriate measures to warn motorists the location of said school bus stop so as to thereby mitigate such dangerous condition or in the alternative to arrange a safe location for said school bus stop."
The board's decision  the failure to act in the face of a known danger  is clearly not that type which is grounded upon the concept of separation of powers, precluding judicial review of the reasonableness of the agency's decision not to act. Instead, it is a decision that courts "are well suited to resolve... under traditional tort doctrine ..." since "[d]efendant failed to warn [or, more accurately as to the facts alleged in the present case, failed to take measures to warn] of a foreseeable, latent danger, and this failure led to ... injury from precisely the expected source... ." Johnson v. State, supra, 447 P.2d at 363.
The majority now apparently holds that an agency's decision not to place warning *655 signs at a known, dangerous location is a discretionary level function.[8] This view flies not only in the face of opinions from other districts cited in this dissent, e.g., Neilson, Savignac, but also in the face of an opinion from this court, Department of Transp. v. Webb, supra, which rejected the Department's argument that its decision to install or not to install warning devices at a railroad crossing was a planning level activity, observing that the "department has not demonstrated that its action or inaction at this admittedly dangerous railroad crossing was based upon `basic governmental policy.'" Id. 409 So.2d at 1064. On the other hand, this court in two other cases, Ingham v. State, Dept. of Transp., supra, and Perez v. State, Dept. of Transp., 414 So.2d 544, (Fla. 1st DCA 1982), has held, on facts which appear indistinguishable from those in Webb, that the government's decision not to place warning devices at a certain location was discretionary.
Under the Johnson analysis, neither of the board's two alternative decisions would be deemed discretionary level functions; consequently, resort to the preliminary, four-factor test announced in Evangelical is, in my judgment, unnecessary.
As I stated earlier in this dissent, the cases  not only from other districts but within our own as well  are in hopeless and irreconcilable conflict. Johnson provides a beacon light to the weary litigant seeking direction on an uncertain sea. Until it is followed, uncertainty and bewilderment will persist in confounding the storm-tossed wayfarer.

ORDER AND OPINION ON MOTION FOR REHEARING AND FOR CERTIFICATION
PER CURIAM.
Appellant's motion for rehearing is denied. However, the court certifies the case to the Supreme Court of Florida under the provisions of Rule 9.030(a)(2)(A)(v), as passing upon questions of great public importance.
ERVIN, LARRY G. SMITH and SHIVERS, JJ., concur.
NOTES
[1] Section 234.112, Florida Statutes (1977), "School bus stops," provides:

Each district school board shall establish school bus stops as necessary at the most reasonably safe locations available. Where unusual traffic hazards exist at school bus stops on roads maintained by the state outside of municipalities, the Department of Transportation, in concurrence and cooperation with and upon request of the district school board, shall place signs at such bus stops warning motorists of the location of the stops.
[2] Appellant's initial complaint was filed against the driver, the owner of the automobile, and his insurer. Appellant thereafter secured leave of court and filed his amended complaint against the school board. After settlement with the other defendants the complaint was dismissed as to them, and the cause proceeded solely against the school board.
[3] Appellant has referred quite extensively to testimony given in depositions (which are included in the record on appeal) in his statement of the facts, although the ruling sought to be reviewed involves only the sufficiency of the complaint to state a cause of action. While this may not be approved appellate procedure, appellee agrees that some of these additional factual matters not pleaded but referred to by appellant might be helpful to the court in visualizing the accident which gave rise to this litigation. For that limited purpose we have noted, as appellant discloses in his statement of facts, that the accident occurred at a point approximately 50 yards from the bus stop; that the deceased child and two companions were proceeding along the east shoulder of the paved road toward the bus stop, when one of the boys picked up a can of water; and that the boy with the can of water started acting as if he were going to throw it on the decedent, at which point the decedent took several quick steps backwards (toward the pavement), and was fatally struck by the passing automobile.
[4] We are unable to conclusively determine the applicability of this portion of the statute, since it clearly requires, as a predicate for any action by the school board, that the bus stop be located on a road "maintained by the state." Section 234.112, Florida Statutes. The complaint identifies the road as "C-95A" which, according to our understanding, indicates a county road. There is no allegation that "C-95A" is either a state road, or a road maintained by the state, and the briefs are silent on this point. Under Section 316.006(1), Florida Statutes (1977), the Department of Transportation has jurisdiction over and the authority to install traffic control devices and warnings on state roads. Under subsection (2) of this statute the counties have similar jurisdiction and authority over county roads. We note further that the statutory directives contained in both subsections are the same, that is, the state (or counties) "may place and maintain" traffic control devices upon the highways or roads "as it shall deem necessary... ." It appears from this limited review of the statutes that Section 234.112 is simply enabling legislation authorizing a request by the school board for action by the Department of Transportation in a matter otherwise solely within the jurisdiction and discretion of the Department of Transportation.
[5] See, for use of this test, Weston v. State, 373 So.2d 701 (Fla. 1st DCA 1979) and Bellavance v. State, 390 So.2d 422 (Fla. 1st DCA 1980).
[6] The reference to the existence of "other remedies" in the Lipman case, 359 P.2d at 467, probably has reference to remedies for relief from the injurious consequences of the questioned acts. We note, however, that certainly there are "preventive" remedies for an improper or unsafe bus stop location, such as requests for re-location, safety patrols at or near bus stops, and parental or other adult supervision for children who might be exposed to unusual hazards enroute to a bus stop. We note further that we are not here dealing with negligent or improper construction or maintenance of any physical facilities associated with a bus stop location.
[7] Appellant also relies on St. Louis-San Francisco Railway Co. v. White, 369 So.2d 1007 (Fla. 1st DCA 1979), and de Jesus v. Seaboard Coast Line Railroad Company, 281 So.2d 198 (Fla. 1973). These cases deal with the violation of a statutory duty as negligence per se, neither involve the issue of sovereign immunity, and the statutes involved in each case required specifically described warning devises at stated locations.
[8] Neilson v. City of Tampa, 400 So.2d 799 (Fla. 2nd DCA 1981); Savignac v. Dept. of Transportation, 406 So.2d 1143 (Fla. 2nd DCA 1981). Cf. Department of Transportation v. Webb, 409 So.2d 1061 (Fla. 1st DCA 1981).
[9] Ingham v. State Dept. of Transp., 399 So.2d 1028, 1029 (Fla. 1st DCA 1981); Perez v. State Dept. of Transp., 414 So.2d 544 (Fla. 1st DCA 1982); Ralph v. City of Daytona Beach, 412 So.2d 875 (Fla. 5th DCA 1982). It should be noted that the Third District, in State Dept. of Transp. v. Vega, 414 So.2d 559 (Fla. 3rd DCA 1982), has reaffirmed its view, stated in A.L. Lewis Elementary School v. Metropolitan Dade County, supra, that the placement or nonplacement of traffic control signals is a discretionary planning level function. Caveat: Of course, our discussion may soon be academic, since the Supreme Court of Florida has granted review of Ingham, supra, Neilson, supra (footnote 8), and Collom v. City of St. Petersburg, 400 So.2d 507 (Fla. 2nd DCA 1981). See, cover (inside), 7 FLW, Vol. 7, No. 5, February 5, 1982.
[10] We limit our holding to the facts of this case, however, since a different ruling might conceivably apply in other situations, for example, where the absence of a warning sign or control device might present a "trap for the unwary" (Cf. Ferla v. Metropolitan Dade County, 374 So.2d 64, at 69 (Fla. 3rd DCA 1979), Pearson, J., concurring in part and dissenting in part). Cf. Department of Transportation v. Webb, supra (footnote 8), where there was evidence of prior accidents, additional signals were planned before, but installed after the accident, and the Department was charged with the responsibility for planning and maintaining the crossing; Banta v. Rosier, 399 So.2d 444, 445 (Fla. 5th DCA 1981), (complaint that an intersection was improperly designed alleged "`planning level of decision-making'" of government); City of Tamarac v. Garcher, 398 So.2d 889 (Fla. 4th DCA 1981), no duty to provide a crashworthy median, but boulder placed where cars continually ran could constitute an intentionally placed hazard or trap, "the intentional creation of a dangerous condition... ."; Savignac v. Department of Transportation, 406 So.2d 1143 (Fla. 2nd DCA 1981), (failure to place signs warning divers of substantially reduced depth of water at bridge, due to dredging operations, where department had prior knowledge bridge was regularly used for diving).
[11] We note, however, that Ferla v. Dade County held that the negligent design and construction of a median strip on the causeway fell within the "operational" class of governmental decision-making, and was thus actionable. The Ferla court declined to rule on whether the county's failure to erect an "impenetrable barrier" on the median strip (to prevent autos from crossing over to the other side causing a headon collision) was "planning" or "operational," but instead reversed summary judgment on this issue and remanded to the trial court for development of an adequate factual basis for determination of the question.
[12] Especially pertinent on this subject is the discussion in Ralph v. City of Daytona Beach, 412 So.2d 875 (Fla. 5th DCA 1982).
[13] Judge Ervin's dissent advocates adoption of a feature of Johnson v. State, see 447 P.2d 352, 361, footnote 8 not mentioned by the court in Commercial Carrier. The dissent suggests that Commercial Carrier's reliance on Johnson v. State was intended as approval of the requirement that immunity is conditional upon the government's showing that a decision was actually accompanied by a conscious balancing of risks and advantages. If so, it would have been a simple matter for the court to have said so. A close reading of Johnson v. State, indicates that this additional step was required in that case because of the specific "discretionary exception" found in the California Code dealing with governmental liability for acts or omissions of a public employer in the exercise of discretion vested in him. To grant or withhold immunity based only upon an assessment of the extent to which government properly considered the risks and alternatives, or the number of risks or alternatives it considered, or the exact process by which it decided to do or not to do a given thing, would introduce an approach thus far not generally adopted by the Florida courts in their efforts to distinguish between "planning" and "operational," functions, although it is clear, as Judge Ervin points out, the courts have reached divergent conclusions. It is also clear that the immunity issue cannot always be decided on the pleadings alone. See, Ferla v. Metropolitan Dade County, supra, footnote 10. However, in perhaps the first case decided by this court under Commercial Carrier, this court found immunity as a matter of law, based solely upon the complaint. Weston v. State, 373 So.2d 701 (Fla. 1st DCA 1979). We did the same in Ingham v. State Dept. of Transp., supra, footnote 9. It therefore seems that we should continue with the task, however difficult, of finding and isolating those areas of "discretionary" functions of governmental agencies that "may not be subjected to scrutiny by judge or jury as to the wisdom of their performance." Commercial Carrier, 371 So.2d at 1022.
[1] In fact, the Oregon Supreme Court, in Smith v. Cooper, 256 Or. 485, 475 P.2d 78 (1970), after despairing of any rule fixing the line between the two levels of activities, rejected the planning/operational level dichotomy.
[2] Indeed, Professor Davis commended the Johnson analysis as deserving "to become the foundation for the building of the law under the `discretionary function' exception... ." K. Davis, Administrative Law Treatise, § 25.08 at 846 (Supp. 1970).
[3] I consider the supreme court's choice of the words "preliminary test" unfortunate in that they suggest that a court's inquiry in identifying the two levels of activity begins with an examination of the Evangelical four-factor test. I submit this was not the intention of the Commercial Carrier opinion because, as I will attempt to explain, infra, that test only has significance once evidence is adduced preliminarily revealing that a decision was made in the exercise of discretion. After such a showing is made, one then turns to the "four preliminary questions" posed in Evangelical to determine whether the challenged act was "truly discretionary," in the sense that it "necessarily involve[d] a basic governmental policy, ... was essential to the realization ... of that policy ...", etc. 407 P.2d at 445. This would appear to be the construction placed upon Evangelical by a later opinion of the Washington Supreme Court further refining the four-pronged test. See Stewart v. State, 92 Wash.2d 285, 597 P.2d 101, 106-107 (1979).
[4] Parenthetically, I would agree with the majority that Section 234.112, authorizing "district school boards to establish school bus stops ... at the most reasonably safe locations available ...", granted to the board the discretion to choose the most reasonably safe location for the stop. (Compare, however, the interpretation placed by the Arizona Court of Appeals upon a statute empowering the Arizona Highway Commission with the authority "to place such traffic control devices `as it deems necessary to warn or guide traffic" as not involving a discretionary function. State v. Watson, 7 Ariz. App. 81, 436 P.2d 175 (1968).) I disagree, however, for the reasons stated infra, that the board made any showing its decision in locating the stop at the particular location was considered.
[5] Those opinions of the district courts of appeal holding that although the original plan for the design of a public project was made at the discretionary level, the activities directly implementing it, such as reducing the plan to blueprints, specifications, and construction, are operational clearly do not comply with the Johnson analysis. See, e.g., Ferla v. Metropolitan Dade County, supra, 374 So.2d at 67 ("the determination of the ... configuration of the median strip, which the county had already determined was to be installed in some form conceptually does not differ from the activity involved in properly maintaining already installed traffic control devices..."); Collum v. City of St. Petersburg, supra, 400 So.2d at 509 ("a blueprint is not a plan in the sense of the `planning' that is discretionary, and once the `planning' has been done, the plans that are then prepared can indeed give rise to liability."); Neilson v. City of Tampa, supra, 400 So.2d at 800 ("[a]ppellees' conceded discretion in planning to build a road does not extend to the actual drawing of the plans and specifications... ."). If only the original plan creating a public project were immune from judicial review, a public entity could never retain immunity from liability for injuries caused by the complete project.
[6] The requirement that the agency be placed on notice, either actually or constructively, of a change in conditions is analogous to the rule that long antedated the enactment of the qualified waiver of sovereign immunity in Florida as to municipalities that were placed on notice of hazardous conditions on streets. Compare Town of Palm Beach v. Hovey, 115 Fla. 644, 155 So. 808 (1934); City of Hialeah v. Revels, 123 So.2d 400 (Fla. 3d DCA 1960). And the same rule has been observed in other decisions postdating the act. See City of Tamarac v. Garchar, 398 So.2d 889 (Fla. 4th DCA 1981); Welsh v. Metropolitan Dade Cty., 366 So.2d 518 (Fla. 3d DCA 1979); Savignac v. Dept. of Transportation, supra.
[7] The majority's opinion suggests, ante p. 649 at n. 13, that Johnson v. State's rule that the government demonstrate its decision was influenced by a conscious balancing of risks and advantages was required by California's enactment of function exception to California Tort Claims Act (Cal. Gov't. Code §§ 810 996.6 (West 1966)). What the majority does not state, however, as was observed by us in Bellavance v. State, 390 So.2d 422, 424 n. 1 (Fla. 1st DCA 1980), is that the Commercial Carrier Corp. opinion judicially grafted such an exception into Section 768.28, Florida Statutes. The Bellavance court obviously determined that Commercial Carrier's adoption of the Johnson analysis included the requirement that the government must present proof of a conscious balancing of risks and advantages since Bellavance held that the state agency had failed to present proof showing that its decision to release an inmate was considered.
[8] The majority states ante, p. 647, n. 10, that it limits its holding to the facts before it, but concedes that a different result "might apply ... where the absence of a sign or control device might present a `trap for the unwary.'" Curiously, however, it refuses to apply this exception to the case before it in which it is alleged that as of the date of the accident the board knew or should have known that the designated location "was attended by unusual traffic hazards which created a dangerous condition... ."