406 So.2d 1143 (1981)
Raymond SAVIGNAC, Guardian of Gary Daniels, Appellant,
v.
DEPARTMENT OF TRANSPORTATION, State of Florida, Appellee.
No. 80-1561.
District Court of Appeal of Florida, Second District.
October 7, 1981.
As Corrected on Denial of Rehearing December 4, 1981.
*1144 Joel D. Eaton of Podhurst, Orseck & Parks, Miami, and Wagner, Cunningham, Vaughan, Genders & McLaughlin, Tampa, for appellant.
John R. Bush and Susan R. Whaley of Macfarlane, Ferguson, Allison & Kelly, Tampa, for appellee.
BOARDMAN, Acting Chief Judge.
Raymond Savignac, guardian of Gary Daniels, plaintiff in the trial court, appeals a final summary judgment against him and in favor of defendant/appellee Florida Department of Transportation. We reverse.
Appellant filed a complaint against Paul Smith Construction Co. (Smith) and Burnup & Simms Co. for damages arising out of injuries sustained by appellant's ward, Gary Daniels, in diving off the Buffalo Avenue Bridge into the Tampa Bypass Canal, the defendants then having been in the process of performing dredging operations on the canal. An amended complaint adding appellee as a defendant was subsequently filed. Appellant subsequently dismissed Burnup & Simms as a party defendant, and Smith's motion for summary judgment was granted.
Appellee's motion to dismiss was granted with leave to amend, and appellant filed a second amended complaint and a third amended complaint against appellee only. Appellee filed an answer and subsequently filed a motion for summary judgment and affidavits and other documents in support of its motion followed by an amendment to the motion. After hearing, the trial court entered final summary judgment in favor of appellee. This timely appeal followed.
The facts in this case are that on June 11, 1975, Daniels, then eighteen years old, dove off the Buffalo Avenue Bridge, which spans the Tampa Bypass Canal. The water was shallow, and Daniels sustained severe injuries; he was permanently paralyzed from the neck down by the accident. He testified on deposition and by interrogatory answers that he had been swimming off that bridge for three or four years, ever since it had been built, and had been swimming in the canal itself nearly all his life. Furthermore, as stated in the answers to interrogatories, "[t]he day he dove off that bridge they had no signs at all indicating that there had been dredging."
The Buffalo Avenue Bridge was reconstructed by appellee as part of the Four Rivers Flood Control Basin project, jointly sponsored by the Southwest Florida Water Management District (SFWMD) and the United States Army Corps of Engineers (the Corps). Part of the project required expansion of Six Mile Creek into a canal, to be known as the Tampa Bypass Canal. The *1145 expansion necessitated the replacement of the existing Buffalo Avenue Bridge.
As a cosponsor of the project, the SFWMD was responsible for providing the necessary easements, removal of utilities, and payment of a percentage of the costs.
As the other cosponsor, the Corps was responsible for expansion of Six Mile Creek into the Tampa Bypass Canal. For this purpose, the Corps entered into three contracts, one of which was with White Pollution Control Construction Company (White) for excavation of the creek in an area approximately half a mile south of the bridge, and another of which was awarded to Smith for diversion of the creek around the construction site of the bridge and into the waterway to be constructed south of the bridge.
Part of Smith's responsibility was to remove from the portion of the creek around the construction site any shoaling  defined as any material which drifts or washes naturally into one area, including one recently excavated from another area. Such shoaling would affect the water level. Smith eventually met this obligation approximately two years after Daniels' injury.
The shoaling at the bridge site at Six Mile Creek could not have been caused by tidal action, because there was none in so small a body of water. It might have been caused in part by the clearing and removal activity of Ticon, Inc., still another company involved in the project. However, it was alleged, "in this case, the major part of the shoaling was caused by heavy rain that eroded the left bank ... on the northwest side of the bridge."
The bridge itself was owned by appellee. In addition, appellee owned a right-of-way extending from fifty to seventy-five feet from the roadway on both sides of the bridge out over the creek and down into the creek itself.
Appellee granted to the SFWMD an easement across its right-of-way, "[f]or any and all purposes necessary or in connection with the construction, maintenance and operation of the Tampa Bypass Canal," but granted no access to the bridge itself. Appellee also granted an easement to Smith permitting it to enter appellee's right-of-way for the purpose of performing its contractual obligation.
Appellee was responsible for any excavation to be performed within its right-of-way, and this work it delegated to Cone Brothers, Inc. It was Cone Brothers' excavation which was to meet and join south of the bridge with that performed by White. It was Cone Brothers' excavation into which Smith was to divert the creek during construction of the bridge, and it was the left bank of the creek built up by Cone Brothers' excavation which in all likelihood created the shoaling after a heavy rain.
Robert F. Grimsley, a maintenance engineer employed by appellee, testified on deposition that the Florida Secretary of Transportation has the authority to order signs erected on bridges warning against any diving or swimming, and when he does so, a violation of the warning is a misdemeanor. Upon the complaint of a property owner that young people were parking on his property before diving off the bridge, the secretary had recently ordered the placement of such a sign on a bridge in the same general area as the Buffalo Avenue Bridge.
However, Grimsley averred in a subsequent affidavit that the only Florida law giving a governmental entity the discretion to erect signs is Section 339.27, Florida Statutes (1975), which authorizes the Board of Highway Secondary Trust Fund Trustees to investigate and determine whether it is detrimental to traffic safety and dangerous to human life for any person to fish from any state road bridge, giving the Board discretion to erect appropriate signs and providing that fishing where it is prohibited is a misdemeanor; that there is no corresponding law concerning diving or swimming from bridges nor any law making the posting of such signs enforceable; and that appellee has many bridges which span waterways in Florida, and it would be impossible to monitor them if signs were posted.
*1146 There has never been a no swimming or no diving sign posted on the subject bridge. However, appellant alleged in his complaint that appellee had actual knowledge of the fact that people were diving from the Buffalo Avenue Bridge and of the fact that the depth of the water adjacent to the bridge had been substantially reduced due to shoaling, and these allegations were not satisfactorily refuted by appellee.
Ordinarily, we would not hold that appellee has a duty to warn of a danger in diving from a bridge due to shallow water. First, as appellee points out, the bridge in question was obviously not designed or erected for diving purposes. Under such circumstances, where a person uses property for purposes for which it was not intended, the owner generally has no duty to warn of dangers on the property, and those who so use the property do so at their own risk. Dranstadt v. City of West Palm Beach, 81 So.2d 484 (Fla. 1955); Biltmore Terrace Associates v. Kegan, 130 So.2d 631 (Fla. 3d DCA 1961), cert. discharged, 154 So.2d 825 (Fla. 1963). The owner is required only to maintain the facilities in question "in a reasonably safe condition for the purposes to which they are adapted and apparently designed to be used." Ramaden v. Crowell, 192 So.2d 525, 528 (Fla. 2d DCA 1966).
Second, as appellee also points out, a property owner generally cannot be held liable for dangerous conditions which exist in natural or artificial bodies of water unless they are so constructed as to constitute a trap or unless there is some unusual danger not generally existent in similar bodies of water. 65 C.J.S. Negligence § 63(100) (1966); Allen v. William P. McDonald Corp., 42 So.2d 706 (Fla. 1949). Shallow water, insufficient for diving, does not constitute a trap. Switzer v. Dye, 177 So.2d 539 (Fla. 1st DCA 1965). Moreover, it is common knowledge that the depth of a small body of water varies with the rainfall. Id.
However, we have a situation here in which, it is alleged, the injured boy had been diving off the bridge for several years. It is reasonable to infer, for purposes of summary judgment, that the depth of the water in the Tampa Bypass Canal was ordinarily sufficient for safe diving and would have been sufficient on the date young Daniels was injured had it not been for the shoaling caused by Cone Brothers' excavation  at the behest of appellee  after a heavy rain (a rain which one would ordinarily assume had, if anything, increased the depth of the water in the canal). Shoaling involves elevation of the bottom of a body of water, American Heritage Dictionary of the English Language (1976), and is thus not apparent upon visual observation, in contrast to a significant lowering of the water level, which would be apparent upon visual inspection. Consequently, we conclude that the alleged lowering of the depth of the canal here as a result of Cone Brothers' excavation, under the allegations in the complaint here, would amount to a trap.
We also have a situation here in which, it is alleged, appellee was aware that people were regularly diving from the Buffalo Avenue Bridge and was further aware that the depth of the water beneath the bridge had been substantially reduced due to the shoaling. When a landowner knows of the continued existence of previous trespassers over a substantial period of time, a trespasser who is injured on the land becomes elevated to the status of a licensee. Libby v. West Coast Rock Co., Inc., 308 So.2d 602 (Fla.2d DCA), cert. denied, 325 So.2d 6 (Fla. 1975). Thus, under the facts alleged, Daniels was a licensee, even if he might otherwise have been considered a trespasser.[1]
The duty owed a licensee is to refrain from wanton negligence or wilful misconduct which could injure him and to warn him of a defect or condition known by the landowner to be dangerous when such danger is not open to ordinary observation by the licensee. Post v. Lunney, 261 So.2d 146 (Fla. 1972); NcNulty v. Hurley, 97 So.2d 185 (Fla. 1957); Libby v. West Coast Rock Co., *1147 Inc., supra. We conclude for purposes of summary judgment that some sort of warning, such as erection of a warning sign, would have been appropriate under circumstances such as those alleged here.
While we have found no Florida law specifically authorizing appellee to post warning signs, neither have we found a law proscribing the posting of such signs. Chapter 334, Florida Statutes (1979), the Florida Transportation Code, gives appellee broad authority to administer the transportation system of this state, and public safety is one of the elements with which the legislature was concerned in enacting this chapter. § 334.02(1). Even were this not so, a duty of reasonable care in carrying out a governmental agency's function is implied. See Commercial Carrier v. Indian River County, 371 So.2d 1010 (Fla. 1979); Mathews v. City of St. Petersburg, 400 So.2d 841 (Fla. 2d DCA 1981); Collom v. City of St. Petersburg, 400 So.2d 507 (Fla. 2d DCA 1981). Finally, a warning sign need not be backed by a statute or ordinance making a disregard for the warning a criminal offense. We are concerned here with attempting to avoid injury to people, not with punishing them should they act with disdain for our attempts. If a person ignores a warning, the natural consequences of doing so may well be much more severe than any criminal punishment he might be subject to, as they certainly were here.
Sovereign immunity is not applicable here. This decision is limited to its facts and is not to be construed as imposing a general duty upon appellee or any other governmental entity to post signs prohibiting diving or swimming in waters which merely may be dangerous, depending on variable circumstances not under the control of the governmental entity involved, particularly in the absence of knowledge on the part of the government agency that people are regularly diving or swimming in the waters involved. We appreciate the fact that appellee has neither the funds nor the manpower to post and maintain such signs on all bridges in the state of Florida, as the trial court pointed out in its ruling. Nevertheless, where, as alleged here, (1) a governmental agency creates, either directly or through action of its agents, a danger not readily apparent to one who could be injured as a result of that danger, (2) that agency has actual knowledge of the danger that has been created, and (3) that governmental agency has actual knowledge of the presence of people likely to be injured as a result of that danger, that agency "must act responsibly and reasonably under the existing circumstances, and in accordance with acceptable standards of care and common sense," Collom v. City of St. Petersburg, supra, at p. 508, and must take steps either to avert the danger or to warn those at risk that the danger exists. Once appellee made the discretionary planning level decision[2] to expand Six Mile Creek into a canal and undertook to do so, it could not negligently ignore the dangers to a known segment of the public that were created by the operations involved in implementing that decision. See Neilson v. City of Tampa, 400 So.2d 799 (Fla. 2d DCA 1981). We hasten to emphasize, however, that all of the material allegations we have identified in this opinion must be proven by appellant at trial in order to hold appellee liable in this case.
Accordingly, the final summary judgment in favor of appellee is REVERSED and the cause REMANDED for further proceedings consistent with this opinion.
OTT and DANAHY, JJ., concur.
NOTES
[1] Since the bridge here is state property, and is open to the public, however, we are inclined to the view that Daniels would be classified as a licensee in any event.
[2] See Commercial Carrier v. Indian River County, 371 So.2d 1010 (Fla. 1979) for a discussion of the difference between planning level decisions, for which a governmental entity retains sovereign immunity, and operational level decisions, for which Florida governmental agencies are no longer immune from tort liability.