ROGER VINSON, Senior United States District Judge *1319 The plaintiff brought this diversity case against the defendant, alleging several counts of negligence after she was seriously injured while diving off a pier into Santa Rosa Sound at Pensacola Beach, Florida. The defendant has filed a motion for summary judgment (doc. 15) (Def. Mot.); the plaintiff has filed a response in opposition (doc. 19) (Pl. Opp.); and the defendant has filed a reply to that response (doc. 21).
I. Standard of Review
Summary judgment is appropriate if all the pleadings, discovery, affidavits, and other materials on file establish there is no genuine disputed issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a), (c). The plain language of Rule 56 mandates the entry of summary judgment, after an adequate time for discovery and upon motion, against any party that fails to prove the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See, e.g., Celotex Corp. v. Catrett , 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
Summary judgment is inappropriate if a reasonable jury evaluating all the evidence could draw more than one inference from the facts, and if that inference creates a disputed issue of material fact. See Allen v. Board of Public Educ. for Bibb County , 495 F.3d 1306, 1315 (11th Cir. 2007). An issue of fact is "material" if it could affect the outcome of the case under the governing law. Anderson v. Liberty Lobby Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is "genuine" if the record, viewed as a whole, could lead a reasonable factfinder to return a verdict for the non-movant. See id. In deciding a motion for summary judgment, the non-movant's evidence is to be believed and all reasonable inferences drawn in her favor.
II. Background
The relevant facts are undisputed and can be stated briefly.
Joanne Williams is the owner of a beach house at 109 Via de Luna, Pensacola Beach. The property fronts the Santa Rosa Sound-which is a protected body of saltwater running parallel to the Gulf of Mexico between Pensacola Bay and Ft. Walton Beach, a distance of about 35 miles-and it has a private wooden pier that extends out from the shore 188 feet. The pier is about 2½ feet above the water. There are steps near the foot of the pier that lead directly into the water from the shore, and there is a "swimming ladder" near the end of the pier, where the water is around 3½ feet deep. The pier doesn't have any guardrails or lights. Santa Rosa Sound is about 2 miles wide at the site of the property, and it has a sand bottom.
Ms. Williams lived in Tallahassee at the time relevant to this case, and the defendant, Paradise Beach Homes, marketed and managed the property for her as a short term vacation rental pursuant to a *1320 property management agreement. Under the terms of that agreement, the defendant would, inter alia , set and collect the rent; conduct semi-annual inspections to assess and rate the "furnishings, equipment, decor and appeal;" and, when necessary, hire contractors to perform "routine" repairs that cost no more than $ 200 (unless there was an emergency or Ms. Williams gave prior approval). The defendant listed the beach house for rent on its website, and under a photo of the pier there was a caption that read: "Private pier is great for boats, fishing and swimming." This photo will be attached as Appendix A.
In May 2016, the plaintiff, Terasa Lynn Knoll, and some friends were staying at the beach house for a week. See Deposition of Terasa Lynn Knoll, dated November 14, 2017 (doc. 15-3) (Pl. Dep.), at 39-43, 54-55.[1] The plaintiff, who was twenty seven years old at the time and living in San Francisco, had never been to the State of Florida. See id. at 9-10, 16-18. Although she had never visited Pensacola Beach before, she "love[d] water" and had significant swimming and diving experience. See id. at 18-23. Specifically, she was on her high school swim team for four years-which included platform diving-and she had dived "hundreds of times" into natural bodies of water all around the world, including the Pacific and Atlantic Oceans, "beaches all through Ecuador," and off the coasts and/or in the lakes of North Carolina, South Carolina, New York, Mexico, and the Galapagos Islands. See id. ; see also id. at 67 (agreeing that "[I am] an experienced swimmer and diver").[2]
The plaintiff flew into Pensacola from San Francisco at approximately midnight on May 26, 2016, after about twelve hours of traveling. See Pl. Dep. at 45-48. She took a car service to the house, and she got there about 12:45 a.m. See id. at 51-52. After visiting with her friends for a little while (and after she "swigged" a drink of vodka), she and one of her friends, Maria Fierro, got "excited" and decided to go swimming. See id. at 51-52, 54-57, 60. They left the house; took off their clothes; went "running or walking really fast" down to the end of the pier; and entered the water at the same time, side-by-side. See id. at 60, 62-65, 70-71. Fierro jumped in feet first (and was not injured), but the plaintiff chose to dive in head first (and hit her head on the bottom and suffered a severe spinal injury). See id. at 64, 66-69, 78. Tragically, she is now a quadriplegic. See id. at 78.
The plaintiff testified that it was "completely dark" the night of the incident and that she could not see how deep the water was; in fact, it appears that she couldn't even see the water much at all. See Pl. Dep. at 62-68 (it was "like black glass almost"). Thus, when she dived off the pier, she was "just basically diving into blackness." See id. at 65. The plaintiff testified that she thought the water was "the ocean" (and not Santa Rosa Sound), so she just presumed that it was going to be "deep water." See id. at 60-62.[3]
*1321 Several years prior to the incident, the homeowner-not the defendant-had painted the words NO DIVING in stencil on the wooden boards at the end of the pier. The plaintiff has described this warning as "weather-worn" [see Pl. Opp. at 5], but she does not dispute that it was still visible. See id. However, the plaintiff testified at deposition that she did not see the warning because she did not look down before she dived off the pier and that, even if she had looked down, she would not have been able to see the words "because it was so dark" that particular night. See Pl. Dep. at 88-90.
The plaintiff reached a significant financial settlement with the homeowner early on, after which she filed this suit against the defendant, alleging negligence, premises liability, and gross negligence. The gravamen of these claims appears to be that the defendant (as the property manager) should have "properly" warned her that the pier was not safe for diving. See Complaint ¶¶ 6, 16, 19, 24, 33-34, 37.[4] The defendant answered the complaint; filed a third party complaint against the homeowner; and now moves for summary judgment.[5]
III. Discussion
Under the law of Florida (which applies to this diversity action), a plaintiff alleging negligence must prove the following four elements: (1) the defendant owed her a duty; (2) the defendant breached that duty; (3) the breach caused her to suffer an injury; and (4) she sustained damages. See, e.g., Clay Elec. Co-op. Inc. v. Johnson , 873 So.2d 1182, 1185 (Fla. 2004). The only element challenged on summary judgment is whether the defendant owed the plaintiff a duty-specifically, "whether Paradise owed Ms. Knoll the duty to warn her against diving from the pier." Def Mot. at 5. As noted just a moment ago, however, there was a painted warning on the pier that specifically said "NO DIVING," but the plaintiff did not look down before she dived into the water and, in any event, it was too dark for her to have read the words even if she had looked down. Thus, the plaintiff appears to be arguing that there should have been a different warning (presumably an elevated and lighted sign), the absence of which renders the defendant liable.[6]
*1322 The plaintiff has not cited any case law holding that property managers have a duty to warn in a situation like the one presented here. All the cases that plaintiff has relied upon (which will be discussed infra , and can be distinguished on their facts) involved property owners. Although the property management agreement at issue provided that the defendant would, inter alia , set and collect the rent, conduct semi-annual inspections to evaluate the "decor," and hire contractors to perform repairs up to $ 200, it does not in any way suggest that defendant assumed an obligation to take it upon itself to install-or have installed-an elevated and illuminated NO DIVING sign on a pier that it neither owned nor built. In fact, although it presents a closer issue, it appears that Florida law would not have even required the property owner to provide such a warning on the facts of this case.
Florida law is well established that:
a property owner generally cannot be held liable for dangerous conditions which exist in natural or artificial bodies of water unless they are so constructed as to constitute a trap or unless there is some unusual danger not generally existent in similar bodies of water.
Tremblay v. South Florida Water Mgmt. Dist. , 560 So.2d 1219 (Fla. 3rd DCA 1990) (canal operator not liable where plaintiff was thrown off inner tube and struck cement blocks near the shore; holding "the accumulation of debris near the edges of waterways is a common phenomenon" and "generally existent in similar bodies of water"); see also, e.g., Kaweblum ex rel. Kaweblum v. Thornhill Estates Homeowners Ass'n , 801 So.2d 1015 (Fla. 4th DCA 2001) (canal operator not liable where victim fell into drainage canal and drowned; holding the steepness of the slope and darkness of the night "[did not] transform this ordinary body of water into a trap or hidden danger"); Navarro v. Country Village Homeowner Ass'n Inc. , 654 So.2d 167 (Fla. 3d DCA 1995) (HOA not liable where victim drowned in a residential lake after stepping into a steep drop-off that suddenly and "drastically changed" the depth of the water; holding the drop-off was not a trap or unusual danger but was "characteristic of lakes"); Seitz v. Surfside , 517 So.2d 49 (Fla. 3d DCA 1988) (oceanfront motel not liable where plaintiff became paralyzed after diving from motel pier; holding the water below the pier, "although insufficient for diving, did not constitute a trap"). Consequently, the critical issue in this litigation is whether the pier and shallow water below presented a "trap" or an "unusual danger" for which a warning should have been given.
As to this issue, Switzer v. Dye , 177 So.2d 539 (Fla. 1st DCA 1965) is instructive. The plaintiff in that case (a minor) dived off the defendant's pier and into a shallow lake, where she struck the bottom and was seriously injured. Although the plaintiff was a trespasser, the case is otherwise similar to the facts of this case; specifically, the pier extended about 100 feet into the lake and stood about 5 feet above the water (here, about 188 feet and 2½ feet, respectively); the depth of the water at the end of the pier was between 3-5 feet deep (here, about 3½ feet deep); and there was a ladder on the pier (same as here). The plaintiff brought suit alleging that defendant was negligent in maintaining *1323 the pier "without signs warning against diving, or signs indicating the depth of the water ...." See id. at 540. The trial court entered judgment in favor of defendant, and the First DCA affirmed. After noting the well settled common law rule that owners of property on natural or artificial bodies of water are not liable for injury "unless they are constructed so as to constitute a trap or present some unusual element of danger lurking about them not existing in [similar bodies of water]," the Switzer court held that "it cannot be said that a depth of water three to five feet beneath a pier five feet above the water constitutes a trap or an unusual element of danger[.] " See id. at 541 (emphasis added). Thus, there was no duty to warn on the facts of that case.
While the plaintiff in Switzer was a trespasser (and not, as here, an invitee), the case has not been limited to that context.[7] For example, in Hughes v. Roarin 20's Inc. , 455 So.2d 422 (Fla. 2d DCA 1984), the plaintiff was a paying guest at a riverside campground resort when he went tubing down the river to a tree equipped with a wooden platform that people could jump from. Id. at 423-24. The platform was reached by climbing steps that had been nailed to the tree. Id. at 424. The plaintiff-who was "experienced in diving"-determined that he could make the dive safely, but when he dived into the water from the platform he sustained a neck injury and was paralyzed. Id. The trial court granted summary judgment for the defendant campground and landowner, and the plaintiff appealed. In affirming, the Second DCA cited and quoted its prior decision in Savignac v. Department of Transp. , 406 So.2d 1143, 1146 (Fla. 2d DCA 1981), which in turn cited Switzer , for the proposition that " '[s]hallow water, insufficient for diving, does not constitute a trap.' " 455 So.2d at 424.[8]
*1324 I have reviewed all the cases that the plaintiff has cited in her response in opposition, but they do not compel a different result. In Turlington v. Tampa Electric Co. , 62 Fla. 398, 56 So. 696 (1911), for example, the Florida Supreme Court held that a claim for negligence could lie for failure to warn after the plaintiff's husband broke his neck (and died) when he dived into shallow water in Hillsborough Bay. Id. at 697. However, the defendant was a "public bathhouse" which provided the plaintiff's husband and all other paying customers with a "springboard" for the specific purpose of diving into the water. Id. The court determined that a springboard in a public bathhouse was a "diving accommodation," and it was in this context that the court used the following language which plaintiff has quoted in her memo:
Where one undertakes to render a service by furnishing accommodations of a public nature, the law imposes a duty to use proper care, precaution, and diligence in providing and maintaining the accommodations in a reasonably safe condition for the purposes to which they are adapted, and are apparently designed to be used. If the accommodations for any reason are not reasonably suitable and safe for the purposes for which they may ordinarily and apparently be used in a customary way, the public should be excluded from their use, or appropriate notice of their unsuitable or unsafe condition should be so given as to warn persons of dangers in using them. A failure to perform these duties or any of them may be negligence that, if it proximately results in injury to another ..., will constitute a cause of action for compensatory damages.
Id. at 698. In this case, the defendant was not a public bathhouse; it did not provide a diving board; it did not represent that the area could be used for diving; nor did it in any way adapt the area for diving. To the contrary, although she did not see it, "NO DIVING" was painted on the pier itself.[9]
*1325 The plaintiff next cites First Arlington Investment Corp. v. McGuire , 311 So.2d 146 (Fla. 2d DCA 1975), which she contends is "more analogous to the instant matter." Pl. Opp. at 8. The plaintiff in that case dived head first off a hotel pier and hit the bottom of the Gulf of Mexico, which rendered him a quadriplegic. 311 So.2d at 148. He sued for negligence, alleging that, as an invitee, the hotel had a duty to warn him of latent or concealed dangers. Id. The hotel argued that the pier was never intended for diving; rather, it was intended for swimming and fishing. See id. at 148, 150-51. Following a jury trial, the trial court entered judgement in favor of the plaintiff. The hotel appealed, and the Second DCA affirmed. The appellate court began its analysis by stating:
It is well settled that a person who invites others on his premises must maintain the premises in a reasonably safe condition and must warn of dangerous conditions existing thereon. This duty extends not only to the ordinary use for which the premises are intended but also to the customary use of the premises by the invitee with the knowledge of the proprietor.
Id. (emphasis added) (citing Schweikert v. Palm Beach Speedway Inc. , 100 So.2d 804, 805 (Fla. 1958) (accepting as "sound" plaintiff's claim that defendant stadium owner not only had the duty to maintain its bleacher seats in a reasonably safe condition for patrons to use as seats -as they were intended-but it also had the duty to maintain them as steps because it knew patrons were using them in such a manner as they went "to and from the exit or to another part of the stadium") ).
The plaintiff notes that the Second DCA ultimately concluded in First Arlington that " 'it was for the jury's determination as to whether or not the appellants were negligent for their failure to warn the appellee not to use the pier for a purpose (diving) other than the admittedly intended purpose. ' " Pl. Opp. at 8 (quoting First Arlington , 311 So.2d at 151 ) (emphasis by plaintiff). However, in the first part of that quoted sentence-in a portion the plaintiff does not emphasize-the court expressly stated that its conclusion was based upon "the circumstances shown by this record." First Arlington , 311 So.2d at 151. Significantly, "the circumstances shown by [the] record" in that case included the defendant knowing that there was a long history of adults and minors "frequently" diving off the pier (including the son of a manager at the hotel); in fact, someone had dived from the pier three years before "and suffered a broken neck due to the shallow water." Id. at 148, 151. These facts led the Second DCA to conclude that the evidence was sufficient for a reasonable jury to find that the hotel knew the pier was being used for diving purposes; that this presented a dangerous condition; and that a warning was therefore required. See id. at 151. This duty to warn of "customary but unintended *1326 uses" is not at issue in our case, by contrast, as there is no claim that anyone had ever dived head first off the pier before the plaintiff's injury-and certainly not that people did so often enough to be considered a "customary" use of the pier. See id. (explaining that "in order to show that the pier was customarily used by the invitees as a diving facility, [plaintiff] necessarily had to prove that the pier was used for such purposes frequently and customarily prior to his unfortunate dive," which he was able to do with the foregoing evidence). Thus, although similar in certain ways, our case is different from First Arlington in this very important respect.
The plaintiff also cites to Brightwell v. Beem , 90 So.2d 320 (Fla. 1956). The plaintiff in Brightwell was visiting a "bathing beach" that was being operated by the defendants on the shore of Lake Ellen in Hillsborough County. Id. at 321. She severed her spinal cord and became paralyzed after she dived head first off a wooden platform and into about three feet of water below. Id. The plaintiff alleged that the defendants had been negligent "in failing to warn, by the posting of signs or otherwise, that the area was dangerous for diving." Id. The defendants argued in response that the platform was originally installed for swimming and sun-bathing, not diving. Id. At trial, the court directed verdict for the defendants after it determined that plaintiff failed to establish that the defendants were negligent. Id. at 322. The Supreme Court of Florida reversed, concluding that a reasonable jury could have found negligence. While at first glance Brightwell appears similar to this case, a closer inspection reveals it to be quite different.
First, the "bathing beach" in that case was part of an amusement park. Id. at 321. The Brightwell court cited Wells v. Palm Beach Kennel Club , 160 Fla. 502, 35 So.2d 720 (Fla. 1948), which states that: "Places of amusement where large crowds congregate are required to keep their premises in reasonably safe condition commensurate with the business conducted.... One operating a place of amusement ... where others are invited is charged with a continuous duty to look after the safety of his patrons." See id. at 721 (emphasis added). The defendant in this case (an off-site manager for a vacation rental) had no such "continuous duty" here.
Moreover, the evidence in Brightwell (similar to First Arlington ) showed that guests of the amusement park "customarily" used the platform for diving-including throughout the afternoon and night of the accident at issue-and that defendants knew about it. See 90 So.2d at 321 ; accord id. at 323 (noting that defendants were "thoroughly acquainted with the fact that their customers were using the platform for diving purposes"). In fact, one of the named defendants, Glea Beem, actually watched the plaintiff as she prepared her dive off the platform. See id. at 321, 323. In addition, Florida's Supreme Court noted that there was insufficient evidence that the plaintiff in that case-a fifteen-year-old girl-recognized and was "familiar with the potential danger" of diving head first into the water. Id. at 323. These particular facts led the court to hold that, although it presented a "close" question, "[a] jury in this state of the record would be justified in concluding that if the platform area was not intended as an area suitable for diving then it was the responsibility of the owners of the amusement park to see to it that their patrons were suitably warned of the restricted usage to which the area might safely be put." Id. (emphasis added).
Unlike Brightwell , this case involves a private pier behind a private house, not an amusement park. There is no contention *1327 that anyone had ever dived head first off the pier before or that defendant knew the plaintiff intended to do so (or that one of its employees watched her prepare for her dive). Nor can there be any argument that the plaintiff-who was not an inexperienced fifteen-year-old girl, but rather a twenty-seven-year-old woman and highly experienced diver-lacked the ability to see a "potential danger" in diving head first off a pier into unfamiliar water that she couldn't even really see. See Pl. Dep. at 63-65 (testifying that it was "completely dark" outside, the water was "like black glass," and she was "basically diving into blackness.").[10]
Lastly, the plaintiff has cited Lienhart v. Caribbean Hospitality Servs., Inc. , 426 F.3d 1337 (11th Cir. 2015). The plaintiff there was a guest at the Aruba Grand Beach Resort and Casino, and while visiting the beach she was "led" by a staff member to a beach chair under a "tiki hut" that was right next to the ocean. Id. at 1338. As she was lounging in this chair (which a hotel employee had put there specifically for her to use), she fell asleep and was hit by a truck driven by one of the resort's tenants, Unique Sports of Aruba, which offered snorkeling and scuba diving trips to hotel guests and used the vehicle to get its boats to and from the water. Id. The district court granted summary judgment for the resort owner, but the Eleventh Circuit reversed. Applying Florida law, in particular McCain v. Florida Power Corp. , 593 So.2d 500, 503 (Fla. 1992) (which held that "a legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others"), the Court of Appeals held:
Unique Sports drives its trucks pulling trailers across a public beach from its facility located adjacent to the hotel. It does so without any demarcation or separation of a driving path and without any warning signs on the beach or back-up devices on the trucks. When Lienhart was struck by the trailer as it was being backed up along the beach, she was asleep on one of the hotel's lounge chairs, where it had been placed by a hotel employee. She had no warning that the vehicles were approaching. Lienhart testified that, although she was generally aware of the movement of the vehicles, she was not aware that they would be driven into that part of the beach where the Aruba Grand placed chairs for its guests' use.
* * *
We conclude that Aruba Grand created a foreseeable, general zone of risk by placing its tiki huts and guest chairs on the beach close to where Unique Sports *1328 drove its trucks and trailers. The hotel thus owed Lienhart a duty of reasonable care which it breached by exercising control over this area of the beach but failing to use any measures to separate vehicular traffic from it. The district court erred in holding that the Aruba Grand did not create a zone of danger.
Id. at 1341 (emphasis added).
Asserting that Lienhart is "instructive for the instant matter," the plaintiff maintains that the defendant similarly created a "zone of risk" or "zone of danger" by not warning her against diving from the pier. See Pl. Opp. at 10-13. But this lawsuit is nothing like Lienhart. As noted, the defendant in Lienhart owned the resort and installed the lounge chairs under tiki huts on the beach close to the ocean. One of its employees directed plaintiff to sit in one of those chairs where she fell asleep, but he did not tell her that a truck-which one would not usually or reasonably expect to be in such an area-would be driving right by her and might strike her while she slept. The underlying point of law from Lienhart (as the plaintiff herself notes, see id. ) is that property owners owe "clear-cut duties" to invitees in Florida, including "the duty to give the invitee warning of concealed perils which are or should be known to the landowner and which are unknown and undiscoverable by the invitee through the exercise of due care. " 426 F.3d at 1339-40 (citing City of Milton v. Broxson , 514 So.2d 1116, 1118 (Fla. 1st DCA 1987) (emphasis added) ). The concealed peril at issue in Lienhart could not have been discovered by plaintiff through the exercise of due care, nor could it have been reasonably anticipated by her. In our case, by contrast, to the extent the shallow water beneath the pier could be considered a concealed peril (and Switzer and its progeny indicate it was not), the danger was discoverable through exercise of due care. The plaintiff possessed the necessary intelligence, experience, and knowledge to see and appreciate the risk of diving head first into unfamiliar water on a "completely dark" night, and she could have ascertained the water depth before she undertook the extremely dangerous activity of "basically diving into blackness." She could have entered the water directly from the shore, climbed down the shore steps, used the swim ladder, or jumped in feet first like her friend did. By not doing so, she failed to "exercise [the] due care" that is required under Lienhart and Florida law.
In sum, in each of the cases that the plaintiff has cited and relied on, the defendants (all of whom were property owners) either affirmatively did something that led to the injury at issue or they failed to act based on prior knowledge. They were a public bathhouse that provided patrons with a diving board ( Turlington ); they were a hotel that provided a pier over shallow water and knew that guests were diving off the pier and did nothing to stop it-despite knowing that another person had previously broken their neck diving from the same pier ( First Arlington ); they were a bathing beach (part of an amusement park) and not only knew that patrons were diving head first off the pier and into shallow water but they actually watched the fifteen-year-old plaintiff prepare her dive and made no attempt to stop her ( Brightwell ); and they were a beachfront resort that directed plaintiff to sit in a specific beach chair near the ocean without warning her that trucks would be driving by ( Lienhart ). None of these cases are comparable to the facts here, where there was no history of anyone ever diving head first off the pier, and the defendant (an off-site property manager) neither owned nor built the pier and was contractually limited in what it was required and allowed to do *1329 with respect to the property.[11]
As there is no genuine disputed issue of material fact on this record, the defendant is entitled to summary judgment.
IV. Conclusion
I recognize that the plaintiff suffered a life-altering injury and has sustained a serious loss. And I am sympathetic to her situation. However, as was said more than 120 years ago:
" ... [H]ard cases, it has been often said, almost always make bad law; and hence it is, in the end, far better that the established rules of law should be strictly applied even though in particular instances serious loss may be thereby inflicted on some individuals, than that by subtle distinctions invented and resorted to solely to escape such consequences, long settled and firmly-fixed doctrines should be shaken, questioned, confused or doubted. It is often difficult to resist the influence which a palpable hardship is calculated to exert; but a rigid adherence to fundamental principles at all times and a stern insensibility to the results which an unvarying enforcement of those principles may occasionally entail, are the surest, if not the only, means by which stability and certainty in the administration of the law may be secured."
Saga Bay Prop. Owners Ass'n v. Askew , 513 So.2d 691, 694 (Fla. 3rd DCA 1987) (denying relief to parents of a six-year-old special needs boy who drowned in lake) (quoting Demuth v. Old Town Bank , 85 Md. 315, 319-20, 37 A. 266, 266 (1897) ).
The defendant's motion for summary judgment (doc. 15) is GRANTED. This ruling necessarily moots the third party complaint against Ms. Williams, and the clerk is directed to enter judgment for the defendant, along with taxable costs, and close this case.[12]
DONE and ORDERED this 29th day of August, 2018.
Appendix A *1330 --------

The plaintiff's friends had rented the house, and they invited her to stay there for free (where she was planning to sleep on "a floor ... a couch or something"). See Pl. Dep. at 39-43. She had not seen and was not party to the rental agreement. See id. at 43-44.

In addition to traditional diving, the plaintiff was also a licensed/certified scuba diver, and she had been scuba diving in Ecuador and South Carolina as well. See Pl. Dep. at 19-20.

Although the plaintiff had dived into the myriad bodies of water indicated above "hundreds of times," she testified that prior to this incident she had never dived into any water-not even the presumptively "deep water" of the Pacific and Atlantic Oceans-until she could determine the depth of where she was diving. See Pl. Dep. at 20-23.

The plaintiff also alleged in her complaint that the defendant should have "fixed" or "cured" the dangerous condition [see Complaint ¶ 18], and in her opposition to summary judgment she notes in passing that there were "no railings around the pier." See Pl. Opp. at 6. Although it is not clear, to the extent she may be suggesting that defendant should have installed guardrails, she has not cited any authority holding that a non-owner property manager is allowed-let alone required-to do such a thing. In fact, as earlier noted, the property management agreement specifically limited repair and maintenance expenditures to $ 200 (absent an emergency or prior approval), and installing guardrails around a 188-foot pier would have obviously exceeded that amount.

The third party complaint is based on a hold harmless provision in the property management agreement which, according to the defendant, provides that it will be entitled to indemnity from the homeowner if it is found liable to the plaintiff. See Third Party Complaint ¶ 7. If the defendant is not liable to the plaintiff, it would appear the third party complaint is moot. See id.

It is not entirely clear what the plaintiff believes the defendant should have done with respect to the warning. Because she didn't look down before diving off the pier, I assume that she is arguing the warning sign should have been raised. Because it was too dark for her to see anything, however, I further assume that she is arguing the sign/pier should have been illuminated. Indeed, unless both things were done, it appears that she wouldn't have seen any warning on the pier that night. This is consistent with the testimony of plaintiff's expert witness, Dr. William Rowley, who opined that the defendant should have put up a warning sign with "enough lighting to see the sign." See Deposition of William Rowley, dated November 7, 2017 (doc. 15-2) (Rowley Dep.), at 79; see also id. at 68-69, 71, 73-74 (the warning sign should have been "apparent," "readable," and "visible" in the dark).

In fact, the Switzer opinion itself states that " '[w]hether the [plaintiff] was a trespasser upon the premises in question is not material.' " 177 So.2d at 540 (citation omitted).

The plaintiff in Savignac was paralyzed after he dived off a bridge and into a shallow canal. The Second DCA stated in that case-as quoted in Hughes above-that a property owner generally cannot be held liable in that situation unless there is an unusual danger or trap, and "[s]hallow water, insufficient for diving, does not constitute a trap." 406 So.2d at 1146. Although Savignac ultimately held that the property owner could be liable, that was only because the canal water was usually deep enough for diving (and there was a history of people safely diving off the bridge, including plaintiff), but it wasn't deep enough that particular day because, unbeknownst to plaintiff, the water level had been lowered after the defendant did excavation work in the canal. In other words, the shallow water was not the result of a natural event (for which there would have been no liability), but rather it was a man-made trap (for which there was). Id. at 1146-47 (holding that the "lowering of the depth of the canal here as a result of [the] excavation ... would amount to a trap" and, thus, "some sort of warning, such as erection of a warning sign, would have been appropriate") (emphasis added).
Hughes and Savignac are not the only cases that have cited Switzer with approval. In Clark v. Lumbermans Mut. Ins. Co. , 465 So.2d 552 (Fla. 1st DCA 1985), for example, the twenty-one-year-old plaintiff ("a good swimmer who was familiar with various water sports") became paralyzed after he dived into shallow water. In affirming summary judgment for the defendants, the First DCA cited Switzer and held there was no duty to warn as the depth of the water was not a "hidden danger." See id. at 554-55.
Although not binding, Dowen v. Hall , 191 Ill. App. 3d 903, 138 Ill.Dec. 933, 548 N.E.2d 346 (1989) is strikingly similar to our case. The plaintiff in Dowen was twenty-three-years-old and invited to stay with friends at a lakeside cottage for the weekend. He had never been to the lake before, so he was unfamiliar with the water. Shortly after he arrived, at or around 1:30 a.m., the plaintiff and his friends decided to go swimming. There was a pier behind the cottage (that extended from the shore 100 feet), but "there were no lights on the pier, ... no appreciable moonlight [and] no signs posted relating to the depth of the water or relating to diving off the pier." Id. at 905, 138 Ill.Dec. 933, 548 N.E.2d 346. The plaintiff "trotted down the pier, took a few running steps, and attempted a shallow dive," even though it was dark and he could not ascertain how deep the water was. He became paralyzed after hitting the bottom of the lake and filed a lawsuit against the property owner. Citing the Florida cases of Switzer and Clark , inter alia , the Illinois court held that the property owner had no duty to warn. See id. at 907, 909, 138 Ill.Dec. 933, 548 N.E.2d 346.
Dowen , in turn, was later cited with approval in Bucki v. Hawkins , 914 A.2d 491 (R.I. 2007), another case that is very similar to ours. The plaintiff in Bucki was a twenty-four-year-old man, and he was a guest at a lake house for the weekend. He arrived at the house around midnight, and shortly after arriving he decided to go swimming in the lake. He "jogged down" a floating dock behind the house and dived head first into the lake, even though it was "pretty dark" outside and he was unable to determine its depth. He struck the bottom of the lake and broke his neck, after which he filed suit against the landowner. The trial court held that the owner had no duty to warn him against diving, and the Supreme Court of Rhode Island affirmed. See id. at 497 ("we are not prepared to impose on every waterfront landowner the burden of warning guests of the danger of diving into water subject to fluctuating depths").
Together, these cases support the conclusion that the property owner had no duty to warn the plaintiff on the facts presented here, which necessarily means the property manager had no duty. See Scott v. Future Invs. of Miami Inc. , 559 So.2d 726, 727 (Fla. 4th DCA 1990) (noting the common law rule applied above and further stating: "If the law is such for an owner of a body of water surely the law is at least the same for a nonowner.")

The plaintiff notes that the pier had a swimming ladder and that the defendant marketed the property online as having a private pier that was "great for boats, fishing and swimming. " As for the property listing on the internet, the plaintiff testified at her deposition that she never saw it and knew nothing about it. See Pl. Dep. at 43-45. As for the swimming ladder, the plaintiff saw it for the first time-and presumably for an instant-as she and Fierro were practically running down the pier. See id. at 45, 63. However, even if the plaintiff reasonably assumed that the pier was good for swimming (either from how the property was advertised or after seeing the swimming ladder for the brief time they were on the pier), swimming and diving are not the same thing. The plaintiff tries to equate the two, but they are clearly different (albeit related) activities. To illustrate, above-ground swimming pools are obviously designed for swimming, but they are not meant for diving. See Sheehan v. North American Marketing Corp. , 610 F.3d 144, 153 (1st Cir. 2010) ("The danger of diving head-first into shallow water in an above-ground swimming pool was, or should have been, obvious to a thirty-two-year-old-adult woman of normal intelligence.").

As earlier noted, the plaintiff testified that prior to this incident she had dived "hundreds of times" into natural bodies of water all around the world, but she had never once dived into any water of indeterminate depth-presumably because she knew it was dangerous. See Pl. Dep. at 19-23. Yet she dived in head first this time, even though her unfamiliarity with the water and the near total lack of visibility made it particularly risky. That begs the question: why would she do that? The plaintiff testified that she thought she was diving into the "ocean," which she just assumed was "deep water." See id. at 60-62. However, while ocean water eventually gets deep, it of course does not start out that way; rather, there is a gradual deepening the further you get from shore. The plaintiff obviously knew that as she had experience diving in both the Pacific and Atlantic, and she had never dived into those ocean waters until she could ascertain the depth of where she was diving. While one can only speculate as to why she chose to do something this time that she had never done before and that she had to know was dangerous, it is reasonable to assume (although it is not necessary to my decision) that the late hour, the long day of coast-to-coast travel, and/or her "swigging" vodka shortly before might have played a role in her decision.

The parties have spent a considerable amount of time in their briefs arguing about whether the defendant has violated Section 64E-9.013, Florida Administrative Code, but I can dispose of that issue quickly. Section 64E-9.013 provides that:
Platforms, diving boards, docks, beaches and walkways shall be kept clean and in good repair. Diving areas shall be readily identified , and shall have and maintain adequate water depth for safe diving based on the depth requirements of public swimming pool construction requirements.
Id. at § 64E-9.013(2)(b)(7) (emphasis added). Assuming this regulation reaches non-owner property managers, as the title of Chapter 64E-9 itself makes clear, it applies to "Public Swimming Pools and Bathing Places." Contrary to plaintiff's novel-but ultimately unpersuasive-argument, water below a private pier behind a private home (even one that is available for rent) is not a "public swimming pool or bathing place." Notably, the plaintiff has not cited any case law to support her argument on this point, and even her own expert witness has expressed doubt about it. See Rowley Dep. at 63-64 (conceding "[I am] not sure if this regulation would apply or not"). And even if it somehow applied, the plain language of the regulation requires that "[d]iving areas shall be readily identified." On its face, it does not say that non -diving areas must be "readily identified" as well.

This also moots the motion for summary judgment that Ms. Williams has recently filed (doc. 23).